[No. S047056. Aug. 20, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
IGNACIO ARRIOLA TAFOYA, Defendant and Appellant.

**COUNSEL**

Michael R. Totaro, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury found defendant Ignacio Arriola Tafoya and codefendant Timothy Wynglarz guilty of the first degree murders (Pen. Code,

§ 187)[1] of Gerald Lee Skillman and Steven Francis Rita, of the robbery (§§ 211, 212.5) of Skillman, and of burglary (§ 459; former § 460.1 [now § 460, subd. (a)]). For each crime, the jury found that defendant personally used a firearm (§ 12022.5, subd. (a)), and that Wynglarz was personally armed with a firearm (§ 12022, subd. (a)(1)). For each murder, as to both defendant and Wynglarz, the jury found to be true special circumstance allegations of murder in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and murder in the commission or attempted commission of burglary (§ 190.2, subd. (a)(17)(G)). In addition, the jury found true one special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)).

The prosecution did not seek the death penalty against codefendant Wynglarz, who was sentenced to life imprisonment without possibility of parole. At defendant's penalty trial the jury returned a verdict of death. The trial court denied defendant's motion for a new trial (§ 1181) and automatic motion for modification of the penalty verdict (§ 190.4, subd. (e)), and it sentenced defendant to death. Applying section 654, the court stayed defendant's robbery and burglary sentences; for each enhancement based on defendant's personal use of a firearm, the court imposed a four-year prison term.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS AND PROCEEDINGS

### A. *Prosecution's Guilt Phase Case*

#### 1. *Background evidence*

On February 10, 1992, defendant bought a red Chevrolet dual-wheel[2] pickup truck and financed the purchase through GMAC Credit Corporation. From October 1992 to March 1993, GMAC sent defendant letters notifying him that he was in default on the loan. Thereafter, GMAC began collection proceedings to repossess defendant's truck.

#### 2. *The murders of Gerald Skillman and Steven Rita*

Douglas Gattenby had been friends with murder victims Gerald Skillman and Steven Rita for years and previously had used drugs with them. Skillman was a small-time marijuana and methamphetamine dealer, and Gattenby had

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] A dual-wheel pickup truck has double wheels on each side of the rear axle.

worked with him in distributing methamphetamine. Skillman lived with his mother and brother on Bannock Road in the City of Westminster, in Orange County. He typically delivered drugs to his customers but occasionally sold them directly from his home to friends. Gattenby had known codefendant Timothy Wynglarz for about 18 years but had not socialized or used drugs with him. A few months before the two murders, Gattenby saw defendant and codefendant Wynglarz at the house of one John Benno, known to Gattenby as a methamphetamine user.

On May 4, 1993, around noon, Joseph Burkhart was working in his front yard on Bannock Road, two houses from Skillman's, when he saw codefendant Wynglarz drive up in a red dual-wheel pickup truck and park in front of Skillman's house. At that time, Gattenby was repairing a lawnmower in Skillman's front yard. Wynglarz asked Gattenby where Skillman was. Gattenby said Skillman was inside the house and told Wynglarz to just go in. Wynglarz went inside but came out a few minutes later. He asked Gattenby to tell Skillman he was going to a store and would return shortly. Gattenby went inside and relayed the message to Skillman, who was upstairs with Rita. Burkhart saw Wynglarz drive away and return in the same red truck about 10 minutes later.

Around this same time, Michael Johnson, a street-sweeping supervisor with the Westminster Department of Public Works, saw two men sitting in a red dual-wheel pickup truck parked under a freeway overpass, less than a minute's drive from murder victim Skillman's house. Johnson saw the passenger bend forward as if to reach for something and then lean back in his seat. The driver and the passenger then both looked in the area of the center console, after which they drove off toward Bannock Road (where Skillman lived). Johnson later identified codefendant Wynglarz from a photo lineup as the man he had seen in the driver's seat, and his description of the passenger matched defendant's.

Around the time codefendant Wynglarz returned in the red truck to Skillman's house on Bannock Road, Harold Hamilton, who lived across the street, saw defendant walking on the sidewalk near Skillman's house. Defendant nodded at Hamilton, who noticed a red dual-wheel pickup truck parked in front of Skillman's house.

While Skillman, Gattenby, and Rita were upstairs in Skillman's house, Gattenby heard a knock on the front door. Rita went downstairs to answer it. At that point, Hamilton saw Rita and codefendant Wynglarz on Skillman's front porch and then saw defendant step onto the porch. Defendant and Wynglarz grabbed Rita by the back of his shirt and pushed him into the house, slamming the door shut behind them. Hamilton heard sounds like

someone inside the house was being thrown around, and he told his mother, Nikki Pillon, to call 911. She did so at 12:15 p.m.

Meanwhile, Gattenby, who was upstairs with Skillman, heard a scuffle downstairs. Skillman ran downstairs. A few seconds later, Gattenby came halfway down the stairs and saw Skillman lying on his side on the living room floor near the front door. Defendant was straddling Skillman and pointing a handgun at Rita, who was on the sofa about five or six feet away. Codefendant Wynglarz was standing near the front door. He did not have a weapon and did not appear to be frightened. Neither Skillman nor Rita had a weapon, and neither was threatening Wynglarz or defendant in any way.

When Gattenby saw defendant's gun, he turned around and ran up the stairs. As he did, he heard Skillman say, "This is my mother's house. You don't have to do this, guys." Defendant replied, "I ain't taking your shit." Gattenby then heard three or four gunshots. Across the street, Hamilton heard gunshots and estimated they had been fired about 45 seconds after he saw defendant and codefendant Wynglarz push Rita into the house.

Codefendant Wynglarz ran upstairs after Gattenby, telling him to "get back, get back." Gattenby ran into Skillman's bedroom and escaped by jumping through the bedroom window. He ran to Burkhart's yard and from there saw defendant and codefendant Wynglarz leave Skillman's house. Defendant was carrying a bag made of canvas or paper. From across the street, Hamilton saw Wynglarz drive off in the red pickup truck, together with defendant. Hamilton's mother, Pillon, saw Wynglarz leave the house with defendant and drop something into a small, nylon-like bag that caused the bag to "bow[]" under the object's weight. She described the object as having "the length of a gun."

After defendant and codefendant Wynglarz had left, Gattenby returned to Skillman's house to check on Skillman and Rita. Skillman was lying on his side in a puddle of blood near the front door, bleeding profusely from the right side of his head. Rita was lying on his back, making gurgling sounds and murmuring.

### 3. *The autopsies, crime scene, and forensic investigations*

Skillman and Rita died from their gunshot wounds. Skillman had a bullet wound to his left interior thigh and another to the top of his head. Black soot surrounded the entry wound on his head, indicating the gun was only inches from his head when fired. Blood-spatter analysis established that Skillman's head was approximately three inches above the floor when he was shot. Rita had suffered two bullet wounds. One bullet entered his left thigh and exited through his right upper back. A second bullet entered Rita's left arm, went

through his shoulder, and entered the base of his skull, lodging behind the left earlobe. Rita was shot from four to five feet away. Both Skillman and Rita had substantial amounts of methamphetamine in their systems at the time of death.

The Orange County Sheriff's Department and Westminster Police Department investigated the crime scene. Recovered from victim Skillman's pockets were a little over $1,300 in cash, two pipes that could be used to smoke drugs, and a closed pocketknife. A briefcase in Skillman's bedroom contained small bags of marijuana and marijuana seeds. Also in the bedroom were several firearms, including a loaded .22-caliber rifle. Victim Rita had no money in his possession.

Also recovered from the scene were four bullet casings, all 10-millimeter automatic, an unusual caliber. Three of the casings were of the Federal brand and one of the Starline brand. All four had been fired from the same gun. Three of the four bullets recovered from the two bodies and the crime scene were fired from a single gun. The fourth bullet was extensively damaged, and thus it could not be definitively established as having been fired from that same gun.

### 4. *Events after the crimes*

About 1:30 p.m. on the day of the murders, an unidentified woman telephoned GMAC Financial Services (GMAC) and said the company could repossess defendant's truck. GMAC picked up the truck at defendant's house around 4:00 p.m.

Three days later, on May 7, 1993, law enforcement authorities arrested defendant and codefendant Wynglarz. Neither man had any visible injuries. Found in defendant's bedroom was an empty Federal brand 10-millimeter automatic ammunition box, the same brand and caliber of casings and bullets recovered from the crime scene.

On July 23, 1993, defendant's wife gave police a 10-millimeter automatic live round of ammunition. It did not match the three Federal brand casings found at the crime scene, but was similar to the Starline 10-millimeter automatic casing that was also recovered.

### B. *Guilt Phase Evidence Presented by Defendant and Codefendant*

### 1. *Defendant's evidence*

In May 1993, defendant was employed at the Valencia Nursery in Anaheim, in Orange County. Defendant's mother and stepfather owned the nursery, which bought mature palm trees and resold them to contractors and new home developers.

Defendant testified at the guilt phase of the trial. He admitted killing the victims but claimed self-defense. On the morning of May 4, 1993, defendant, his wife, and their three children drove with codefendant Wynglarz to Anaheim in defendant's red dual-wheel pickup truck. Defendant took with him a 10-millimeter Colt pistol because he expected to carry a lot of cash that day. He put the gun under the driver's seat. Defendant dropped off one child at school, his wife at the hospital where she worked, and the other two children at his mother's house. When defendant stopped to have his truck washed, Wynglarz telephoned murder victim Skillman regarding some weapons and speakers he had left with Skillman. Wynglarz told defendant that he wanted to pick up those items from Skillman's house, and that Skillman had agreed to give him back money for drugs Wynglarz had bought from Skillman that were "no good." Wynglarz described Skillman as "a very dangerous person," adding that if defendant "ever bumped into him," defendant "would be killed."

Around 11:45 a.m., defendant and Wynglarz drove toward Skillman's house. Before they reached the house, Wynglarz said that Skillman was suspicious of strangers and that he wanted to drive defendant's truck alone to the house. Defendant agreed and waited at a nearby liquor store while Wynglarz drove off in defendant's truck.

About 10 minutes later, Wynglarz returned saying he needed more time with Skillman because Skillman was busy. Defendant took his gun from under the driver's seat and tucked it in his waistband under his shirt. Wynglarz left again in defendant's truck for Skillman's house.

Concerned about being late in picking up his children, defendant started walking in the direction in which codefendant Wynglarz had left in defendant's red truck. When defendant saw the truck parked in front of a house, he headed towards it. Upon reaching the house, defendant saw Wynglarz and murder victim Rita on the front porch, arguing about being "burned . . . with some dope." Defendant went up to the front porch and stood by Wynglarz. Rita and Skillman then attacked defendant from inside the front door. Inside the house, Skillman grabbed defendant's shirt, exposing defendant's gun. Defendant and Skillman both reached for the gun. One shot was fired, hitting Skillman, who went down on his left knee but kept his grip on defendant's shirt. Defendant fired a second shot at Skillman, who hit the floor. Defendant continued to struggle with Rita, shooting him twice, and watching him fall to the floor.

Defendant dropped the gun, but Wynglarz said, "Don't leave the gun there." Wynglarz then put the gun in a small black bag full of papers and magazines, and he took it with him when he and defendant left in defendant's truck.

Later that day, when defendant stopped at a McDonald's restaurant near his house and bought some hamburgers, he had three $100 bills, which he had had since that morning, and a $20 bill, which his mother had given him. Defendant exchanged one of his $100 bills for $5 bills and gave $50 to Wynglarz. After defendant returned to his house, he threw the bag with the gun in a trash bin.

### 2. *Codefendant Wynglarz's evidence*

Wynglarz testified that he and murder victim Skillman used methamphetamine, which they also bought and sold along with other drugs.

On the day of the murders, Wynglarz arranged a meeting at Skillman's house to discuss paying off a debt Wynglarz owed to a pawnshop. Wynglarz had no plan to steal from Skillman and was unaware that defendant had such a plan. When defendant shot Skillman and Rita, Wynglarz ran upstairs, fearing for his life. Defendant followed, telling him, "Let's get out of here." Defendant ordered Wynglarz to grab a duffel bag, which Wynglarz later learned contained papers. Wynglarz took the bag, and they left in defendant's truck.

### C. *Prosecution's Penalty Phase Case*

Susan M. testified that on January 27, 1980, in Anaheim, two men raped her at gunpoint. After working as a prostitute that evening, she had accepted a ride home from two men, who offered her a seat in the back of the car. Defendant was the driver. The passenger pointed a gun at her, got into the backseat, and forced her to engage in sexual intercourse while defendant drove the car. After a while, defendant stopped the car, moved to the backseat, and forced Susan M. to have sexual intercourse with him while the other man drove.

Defendant's wife, Grace Tafoya, testified she married defendant in 1984. They had three children together, aged nine, seven, and three years. In April 1989, defendant hit and slapped Grace in the face and twisted her arm. On October 11, 1989, when defendant became enraged because he could not find the keys to his truck, he lifted two mattresses into the air, punched a wall, and threw Grace's clothes around the bedroom. On another occasion, defendant punched Grace in the arm, causing pain and bruising.

Defendant had a son, Edward A., with another woman. In 1991, when Edward was about eight years old, he came to live with defendant and Grace. Once, defendant beat Edward in a barn behind the house. Another time, defendant beat Edward with a belt.

On October 19, 1991, Riverside County Deputy Sheriff Phillip Matheny investigated a claim of child abuse involving Edward. The child had red and blue marks on his lower back, arm, and right thigh, consistent with having been beaten with a rope or belt. The parties stipulated that on April 16, 1992, defendant pled guilty to two misdemeanor counts of committing corporal injury on Edward (§ 273d), and he was placed on three years' probation.

Oscar Reyes repossessed motor vehicles for Interstate Recovery Service. On March 4, 1993 (two months before the two murders in this case), GMAC retained Reyes to repossess defendant's red dual-wheel pickup truck. Reyes found the truck at the nursery where defendant worked. He got in on the driver's side and tried to start the ignition. At that point, defendant opened the passenger door and pulled a handgun from under the seat, pointing it at Reyes. When Reyes said he was there to repossess the truck, defendant replied, "Fuck, if you think you are going to take my truck, I am going to shoot your fucking ass." Reyes left and reported the assault to the Anaheim police.

The prosecution presented victim impact evidence through the testimony of Skillman's mother, Coleen Skillman, and Rita's mother, Sandra Zide. Coleen's life was torn apart by her son's death. Zide was devastated by the loss of her son, who was planning to marry. When told of Rita's death, his fiancée became hysterical. Rita's murder also deeply affected Rita's brothers, sister, grandparents, and nephew.

D. *Defense Penalty Phase Case*

In the mid-1980's, defendant was a devoted Christian, had trained as a minister, and worked in church ministries in Puerto Rico, the Dominican Republic, and throughout the United States. Defendant used his own money to buy food and clothing for needy people and gave them shelter in his home.

For about 10 years, defendant attended the Apostolic Church in Huntington Beach, where he participated in Bible studies and other church activities. During trial, the wife of the pastor of the Apostolic Church visited defendant in jail. He cried when she tried to read to him.

Defendant's mother, Eva Cancino, testified defendant's father left the family when defendant was five years old. The father drank a lot, was very strict, and hit defendant with a rope and a belt. Defendant's mother left Mexico and brought her children to the United States, supporting them by picking fruits and vegetables and selling burritos. She later met and married defendant's stepfather, who owned a gardening business. When the mother of defendant's son, Edward, abandoned him, defendant took care of Edward.

Defendant had many animals, including a pony and several lambs, which he liked to take to church fairs so that children could ride or pet them. Defendant cried when his mother spoke to him about the murder victims.

## II. PRETRIAL ISSUES

### A. *Severance Motion*

Before and during trial, defendant unsuccessfully moved to sever his trial from codefendant Wynglarz's. He now contends the trial court abused its discretion in denying his severance motions, thereby violating his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and under article I, sections 15 and 16 of the California Constitution.

Before trial, defendant moved for severance based on his expectation that the trial court would admit statements codefendant Wynglarz had made to the police that implicated defendant in the offenses.[3] (See *Bruton v. United States* (1968) 391 U.S. 123, 137 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People v. Aranda* (1965) 63 Cal.2d 518, 526–527 [47 Cal.Rptr. 353, 407 P.2d 265].) The trial court denied the motion without prejudice because the prosecution had yet to determine whether it would use Wynglarz's statements. Defendant twice renewed the motion; on both occasions, the trial court denied it. After the prosecution's case-in-chief, defendant asserted as an additional ground for severance that Wynglarz's defense would conflict with his own. The trial court again denied the motion. In his motion for a new trial, defendant again asserted his trial should have been severed from Wynglarz's.

We note that codefendant Wynglarz's statements to the police were never introduced at trial.[4] Further, we assume without deciding that defendant's motion for severance on the basis of conflicting defenses brought *after* the prosecution's case-in-chief was nonetheless timely. (See *People v. Simms* (1970) 10 Cal.App.3d 299, 306 [89 Cal.Rptr. 1].)

---

[3] As an offer of proof, defendant asserted that codefendant Wynglarz told the police that defendant ran up to murder victim Skillman's house with a gun in his hand, pushed Wynglarz and Gattenby inside, pushed and shot Skillman, and that when Wynglarz asked defendant why he had shot Skillman, defendant said he thought Skillman had money.

[4] On cross-examination by the prosecutor, codefendant Wynglarz denied that defendant had ever made a comment about Skillman's having money and further denied that defendant was looking for money at Skillman's house. On appeal, defendant complains that the prosecutor's questions conveyed to the jury that defendant had said that he was looking for money. The trial court, however, instructed the jury that questions by counsel were not evidence, that no fact implied by a question could be assumed to be true, and to disregard any question to which an objection was sustained. We assume the jury followed these instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 559 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." (See *People v. Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25] [recognizing legislative preference for joint trials].) Defendants "charged with common crimes involving common events and victims" present a " 'classic case' " for a joint trial. (*People v. Keenan* (1988) 46 Cal.3d 478, 499–500 [250 Cal.Rptr. 550, 758 P.2d 1081].) Nonetheless, a trial court, in its discretion, may order separate trials " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, *conflicting defenses*, or the possibility that at a separate trial a codefendant would give exonerating testimony.' [Citations.]" (*People v. Avila* (2006) 38 Cal.4th 491, 574–575 [43 Cal.Rptr.3d 1, 133 P.3d 1076], italics added.)

A trial court's denial of a severance motion is reviewed "for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion." (*People v. Avila, supra,* 38 Cal.4th at p. 575; see *People v. Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) A trial court's erroneous refusal to sever a defendant's trial from a codefendant's requires reversal if the defendant shows, to a reasonable probability, that separate trials would have produced a more favorable result (*People v. Avila, supra,* 38 Cal.4th at p. 575; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41 [17 Cal.Rptr.3d 710, 96 P.3d 30]), or if joinder was so grossly unfair that it deprived the defendant of a fair trial (*People v. Avila, supra,* 38 Cal.4th at p. 575; *People v. Ervin* (2000) 22 Cal.4th 48, 69 [91 Cal.Rptr.2d 623, 990 P.2d 506]).

At the guilt phase, codefendant Wynglarz's defense was that defendant had acted entirely alone. Defendant asserts this conflicted with his own defense that he shot Skillman and Rita in self-defense, thus requiring severance. We do not agree that severance was required. " '[A]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.]" (*People v. Hardy, supra,* 2 Cal.4th at p. 168; see also *Zafiro v. United States* (1993) 506 U.S. 534, 538 [122 L.Ed.2d 317, 113 S.Ct. 933] ["Mutually antagonistic defenses are not prejudicial *per se*"].) That is not the situation here. As we recently observed in *People v. Coffman and Marlow, supra,* 34 Cal.4th at page 41, "[w]hen . . . there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance."

Here, the prosecution presented strong evidence of defendant's guilt independent of the evidence codefendant Wynglarz offered in his own defense. Murder victim Skillman was a marijuana and methamphetamine dealer and had worked with prosecution witness Gattenby distributing methamphetamine. Gattenby had seen defendant at the home of John Benno, a known methamphetamine user. Defendant was apparently in need of money as he was in default on his truck loan, and GMAC had begun collection proceedings against him. And prosecution witness Hamilton, a neighbor of Skillman's, saw defendant and codefendant Wynglarz enter Skillman's house after shoving murder victim Rita inside. Gattenby, who was at the house, saw defendant wave a gun over Skillman, who was lying on the floor, and at Rita, who was on the sofa a few feet away. Gattenby heard Skillman plead for his life moments before hearing several shots. All four bullet casings found at the crime scene were 10-millimeter and fired from the same gun. Three of the four casings were Federal brand 10-millimeter, thus matching the description on an empty ammunition box recovered from defendant's house. Both victims were shot twice. Because this evidence independently established defendant's guilt of the two murders, demonstration of his guilt was not dependent on codefendant Wynglarz's defense. Thus, the trial court did not abuse its discretion in denying defendant's severance motion.

Nonetheless, defendant maintains that the joint trial deprived him of his rights to due process and a fair trial under both the state and federal Constitutions, asserting that a statement murder victim Skillman made to witness Gattenby about a prior drug deal between Skillman and codefendant Wynglarz ("[Wynglarz] burned me for a quarter ounce of meth") that was excluded in the joint trial would have been admitted in support of defendant's self-defense theory in a separate trial. As a preliminary matter, defendant has forfeited this issue on appeal because he failed to assert this ground at the time his severance motion was heard by the trial court. (*People v. Ervin, supra,* 22 Cal.4th at p. 68; *People v. Hardy, supra,* 2 Cal.4th at p. 167.) In any event, as later discussed (see pt. III.B., *post*), because defendant suffered no possible prejudice from the exclusion of Skillman's statement, he has not demonstrated that the joint trial with codefendant Wynglarz deprived him of his rights to a fair trial or due process. (See *People v. Box* (2000) 23 Cal.4th 1153, 1197 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669].)

Defendant argues that the joint trial deprived him of his right to a fair trial because the trial court told prospective jurors during voir dire that the prosecution was seeking the death penalty against defendant only and not against codefendant Wynglarz. Because defendant failed to raise this issue in the trial court at the time of his severance motion, he has not preserved it for appeal. (*People v. Ervin, supra,* 22 Cal.4th at p. 68.) In any event, the claim lacks merit. Both this court and the United States Supreme Court have upheld

the practice of conducting joint trials of defendants eligible for the death penalty with those who are not. (See, e.g., *People v. Box, supra,* 23 Cal.4th at pp. 1195–1197 [joint trial in capital case with only one defendant facing the death penalty did not violate the federal constitutional rights to due process, an impartial jury, a fair trial, and a reliable death verdict of the death-eligible defendant]; *People v. Freeman* (1994) 8 Cal.4th 450, 483, 496 [34 Cal.Rptr.2d 558, 882 P.2d 249] [no error in denying capital defendant's motion to sever trial from codefendant who did not face capital charges]; *People v. Pinholster* (1992) 1 Cal.4th 865, 903, fn. 2, 932–934 [4 Cal.Rptr.2d 765, 824 P.2d 571] [capital defendant was not deprived of his rights to a fair trial and due process by joint trial with codefendant who did not face the death penalty]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1048–1049 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [no abuse of discretion in denying capital defendant's motion to sever joint trial]; see also *Buchanan v. Kentucky* (1987) 483 U.S. 402, 420 [97 L.Ed.2d 336, 107 S.Ct. 2906] [defendant who did not face the death penalty in a capital case suffered no violation of his right to an impartial jury by joint trial].)

Finally, defendant contends the joint trial denied him the right to a jury drawn from a representative cross-section of the community based on codefendant Wynglarz's use of peremptory challenges against prospective jurors with Hispanic names. But defendant never objected when Wynglarz exercised those peremptory challenges, nor did he raise this ground in his severance motion. Defendant also failed to make an adequate record of the ethnicity of prospective jurors, making it difficult for a reviewing court to determine which prospective jurors were Hispanic. Therefore, he has not preserved this issue for appellate review. (*People v. Ervin, supra,* 22 Cal.4th at p. 68.)

### B. *Evidence About Prosecution Witness Gattenby*

Before trial, defendant sought a ruling from the trial court on the admissibility of certain statements purportedly contained in a search warrant affidavit pertaining to prosecution witness Gattenby. According to defendant's attorney, the affiant stated that police believed Gattenby was in possession of explosives and had a reputation for dangerousness. Counsel asserted that this information would support defendant's theory of self-defense by showing defendant feared Skillman and Rita at the time of the murders based on their association with Gattenby. Counsel further argued the statements were generally relevant to impeach Gattenby. Counsel made no offer of proof, however, that defendant knew of Gattenby's reputation for being dangerous.

The trial court found that the affidavit information regarding Gattenby was irrelevant absent a showing that defendant had reason to fear that Gattenby was dangerous, and that in any event it was inadmissible to show that

Gattenby was in fact dangerous. Absent such a showing, the trial court ruled, defendant could not cross-examine Gattenby about whether he had possessed dynamite or weapons, or whether he had a reputation for dangerousness.

Defendant now challenges that ruling as violating his rights to due process and to a fair trial under both the state and federal Constitutions.[5] We disagree.

■ When, as here, the relevance of proffered evidence depends upon the existence of a foundational fact, the proffered evidence is inadmissible unless the trial court determines it "is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence." (*People v. Marshall* (1996) 13 Cal.4th 799, 832 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; see Evid. Code, § 403, subd. (a)(1).) We review a trial court's ruling on the sufficiency of the foundational evidence under an abuse of discretion standard. (*People v. Marshall, supra,* 13 Cal.4th at p. 833.)

As the trial court indicated, evidence that Gattenby was dangerous was relevant to defendant's claim of self-defense only if defendant knew of Gattenby's reputation for dangerousness and was afraid of him. (See, e.g., *People v. Minifie* (1996) 13 Cal.4th 1055, 1065–1069 [56 Cal.Rptr.2d 133, 920 P.2d 1337] [evidence of group's reputation for violence and prior threats against the defendant was relevant to the defendant's state of mind in claiming self-defense for assault because the defendant reasonably associated the victim with the threats].) Defendant, however, presented no evidence that he knew of Gattenby's reputation for dangerousness or of Gattenby's association with murder victims Skillman or Rita. Indeed, defendant never testified he had even seen Gattenby at Skillman's house on the day of the murders. Thus, Gattenby's presence at the house was not part of defendant's claim of self-defense. Gattenby, moreover, testified that, before the day of the murders, he had seen defendant only once and did not know his name. No evidence

---

[5] In this and a number of the arguments we later address, defendant contends that the error he is asserting infringed his constitutional rights to due process and a fair trial. Our recent observation in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (See also *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

was presented at trial that Gattenby acted in an aggressive manner toward defendant or codefendant Wynglarz. Under these circumstances, evidence of Gattenby's reputation for being dangerous was not relevant to defendant's claim of self-defense.

Finally, defendant asserts the trial court's ruling precluding cross-examination of Gattenby regarding his reputation for dangerousness violated defendant's constitutional rights under the confrontation clauses of the federal and state Constitutions (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15), and compelled him to testify in violation of his constitutional rights against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15). Defendant did not rely on these grounds at trial; thus he has forfeited them on appeal. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19 [47 Cal.Rptr.3d 467, 140 P.3d 775] [defendants forfeited confrontation clause claim by failing to raise it at trial].)

C. *Request for Telephone Privileges*

Before trial, at defendant's request, the presiding criminal judge ordered that defendant be allowed to meet with the defense investigators. But the presiding judge denied defendant's request for toll-free telephone calls to defense counsel, noting that defense counsel and the defense investigators all accepted collect calls. Thereafter, the presiding judge issued three successive orders permitting defendant to make toll-free telephone calls to persons other than his attorneys and investigators to gather information for his defense. Each of these orders was in effect for about 45 days, and each had expired before trial.

In the trial court, defense counsel sought an order permitting defendant to make telephone calls to the defense team after the start of his trial. The court declined to rule on the request, informing counsel that court policy required that such motions be presented to the presiding criminal judge. Nothing further regarding this matter appears in the record. Notably, defense counsel never sought an order from the presiding judge granting defendant telephone access after trial started.

Defendant now contends the trial court's "refusal" to issue an order permitting him to telephone his attorneys and investigators after the start of the trial interfered with his right to counsel and deprived him of due process under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and under article I, sections 15 and 16 of the California Constitution. We disagree.

Defendant had ample opportunity to consult with his attorneys in court during his trial. Nothing suggests defendant's appointed counsel lacked

"resources for investigation and the means to present a defense." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1001 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Under these circumstances, defendant has not shown any deprivation of his right to assist counsel in preparing his defense.

### D. *Voir Dire Procedures*

*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] (*Hovey*), held that prospective jurors in capital cases should be sequestered and questioned individually regarding their views on the death penalty. In 1990, the voters adopted Proposition 115, which as relevant here, abrogated *Hovey* by adding to the Code of Civil Procedure a provision stating that "where practicable, [voir dire shall] occur in the presence of the other [prospective] jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.) Defendant's trial occurred in 1995.

Before trial, defendant requested that each juror be questioned individually. In denying this request, the trial court explained that it would conduct the death-qualification portion of voir dire in groups of 16 to 18 prospective jurors. After the court had proceeded in this manner, defense counsel, citing *Hovey, supra*, 28 Cal.3d 1, asked the court to individually question the remaining prospective jurors. Counsel asserted that *Hovey* was still good law, noting it had been cited by this court in cases decided *after* the June 5, 1990, effective date of Proposition 115.[6] The trial court denied counsel's request, noting that although it did not individually question every prospective juror, it had, at the request of any party, individually questioned those prospective jurors who had expressed some reluctance at deciding between life without possibility of parole or the death penalty in a capital case. The court resumed the group voir dire for the death qualification of the remaining prospective jurors, and it ruled on challenges for cause. Thereafter, the prosecutor and the attorneys for defendant and codefendant Wynglarz were each given one hour to question the prospective jurors. After the parties made their peremptory challenges, the court indicated that jury selection was complete, and counsel accepted the jury without objection.

On appeal, defendant faults the trial court for denying his request for individualized, sequestered voir dire of each prospective juror. He asserts violations of his federal constitutional rights to due process and an impartial

---

[6] Defense counsel was apparently referring to this court's decisions in capital cases filed after Proposition 115's June 5, 1990, effective date (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299–300 [279 Cal.Rptr. 592, 807 P.2d 434]), reflecting the application of *Hovey* in cases in which the trial took place before that date. (See, e.g., *People v. Schmeck* (2005) 37 Cal.4th 240, 257, fn. 4 [33 Cal.Rptr.3d 397, 118 P.3d 451] [1989 trial]; *People v. Bemore* (2000) 22 Cal.4th 809, 834–835, fn. 14 [94 Cal.Rptr.2d 840, 996 P.2d 1152] [same].)

jury under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and under article I, sections 7, 15, and 16 of the California Constitution.

Under Code of Civil Procedure section 223, the question of whether individual, sequestered voir dire should take place is entrusted to the trial court's discretion. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 632, fn. 3 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Discretion is abused when the questioning is not reasonably sufficient to test prospective jurors for bias or partiality. (*People v. Box, supra*, 23 Cal.4th at p. 1179.)

The trial court here did not abuse its discretion in questioning prospective jurors in small groups of 16 to 18 about their death penalty views. (Code Civ. Proc., § 223; *People v. Box, supra*, 23 Cal.4th at p. 1178.) The court acknowledged it had the discretion to question prospective jurors individually, but it reasoned that questioning in small groups would yield more candid responses. Moreover, on several occasions, the court conducted individual, sequestered voir dire at the request of either the prosecutor or defense counsel when a prospective juror expressed concerns with the death penalty.

Finally, defendant complains that the parties were limited to one hour of general voir dire on a day different from the trial court's death-qualification voir dire and that the court conducted "most of voir dire."[7] Because defendant did not raise these issues in the trial court, he has not preserved them for appeal. (*People v. Vieira* (2005) 35 Cal.4th 264, 289 [25 Cal.Rptr.3d 337, 106 P.3d 990].)

In any event, those contentions lack merit. " 'The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.' " (*People v. Box, supra*, 23 Cal.4th at p. 1179, quoting *Morgan v. Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 112 S.Ct. 2222].) "[T]he trial court is given wide latitude to determine how best to conduct the voir dire . . . ." (*People v. Chaney* (1991) 234 Cal.App.3d 853, 861 [286 Cal.Rptr. 79], citing *Rosales-Lopez v. United States* (1981) 451 U.S. 182, 189 [68 L.Ed.2d 22, 101 S.Ct. 1629].) Whether the prospective jurors are required to complete a written questionnaire is a matter within the trial court's discretion. (See *People v. Box, supra*, 23 Cal.4th at p. 1180 [trial court used a questionnaire proposed by the defense in formulating questions it asked during voir dire and provided the parties an opportunity to supplement questions]; see also § 1044 [the trial judge has the duty to control all

---

[7] Defendant also criticizes the trial court for not requiring prospective jurors to complete juror questionnaires. The parties, however, stipulated not to use questionnaires.

trial proceedings "with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"].) Defendant here has failed to show any abuse of discretion by the trial court.

E. *Trial Court's Comments About Hardship Exclusions*

Defendant accuses the trial court of misconduct in explaining to the jury panel the circumstances of hardship that would warrant being excused from jury service.

This is what the trial court said: "With respect to hardship, there are certain individuals that fall into a category where serving on a case such as this would be an extraordinary hardship. If you are the sole support of your family or you are—you share the responsibility for the support of the family or your own sole support and you work for someone who will not pay you to serve on jury duty or will only pay you for five days or 10 days and at that point you will be losing salary and will be unable to support yourself or your family, that would be an extraordinary hardship.

"If you have a medical condition that would prevent you from being able to serve over the period of time that I have suggested, and there may be other unique situations where it would be an extraordinary hardship. [¶] What is not a hardship is 'my employer really needs me at work right now. This is really a busy time.' In the law there are specific criteria that I apply to hardship. 'I would rather sit on a shorter case. I don't mind serving, but I just can't serve on a long case.' Those kinds of personal preferences I am not permitted by the law to excuse you based upon that kind of hardship. [¶] But if it is an undue hardship based upon financial, medical or some other situation that you think is unique to you that would cause the Court to excuse you, I will consider all of those requests today."

Defendant made no objection to the trial court's statement. But he now contends the statement deprived him of a fair cross-section of the community because it "may have" resulted in excluding prospective jurors in lower economic groups. By failing to make a contemporaneous objection to the trial court's statement, defendant has not preserved this issue for appeal. (*People v. Champion* (1995) 9 Cal.4th 879, 906–907 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

■ In any event, the claim lacks merit. In reviewing that claim, the pertinent inquiry is whether a cognizable class has been excluded. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1214 [255 Cal.Rptr. 569, 767 P.2d 1047].) On point here is this statement from *Johnson*: "Even assuming that only poor persons were given hardship exclusions, a fact not proven here, persons with low incomes do not constitute a cognizable class." (*Ibid.*)

### III. Guilt Phase Issues

#### A. Sufficiency of the Evidence of the Robbery, Burglary, and Murders

##### 1. Robbery, burglary, and first degree felony murder

Defendant contends the evidence is insufficient to support his robbery conviction and the robbery-murder special-circumstance finding because the prosecution failed to present substantial evidence that he formed the intent to steal before or during, rather than after, the fatal shootings of Skillman and Rita. The absence of this evidence, defendant argues, infects the burglary conviction, the burglary-murder special circumstance, and the convictions for first degree murder to the extent they are based on a theory of felony murder. We conclude sufficient evidence supports the convictions and special circumstance findings.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 790–791 [60 Cal.Rptr.2d 1, 928 P.2d 485] [same standard of review applies to determine the sufficiency of the evidence to support a special circumstance finding].) "Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) If the other elements are satisfied, the crime of robbery is complete without regard to the value of the property taken. (*People v. Simmons* (1946) 28 Cal.2d 699, 705 [172 P.2d 18]; *People v. Coleman* (1970) 8 Cal.App.3d 722, 728 [87 Cal.Rptr. 554].) The intent to steal must be formed either before or during the commission of the act of force. (*People v. Kipp, supra,* 26 Cal.4th at p. 1128; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Frye* (1998) 18 Cal.4th 894, 956 [77 Cal.Rptr.2d 25, 959 P.2d 183].) With respect to burglary, that crime requires an entry into a specified structure with the intent to commit theft or any felony. (*People v.*

*Horning* (2004) 34 Cal.4th 871, 903 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Davis* (1998) 18 Cal.4th 712, 723–724, fn. 7 [76 Cal.Rptr.2d 770, 958 P.2d 1083]; § 459.)

■ Under the felony-murder rule, a murder "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including robbery and burglary, is first degree murder. (§ 189.) The robbery-murder and burglary-murder special circumstances apply to a murder "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of" robbery and burglary, respectively. (§ 190.2, subd. (a)(17)(A), (G).) "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

■ Here, the prosecution's theory was that defendant and codefendant Wynglarz planned to steal drugs or money from Skillman, a known drug dealer, at his house; once there, defendant killed Skillman and Rita during that planned burglary and robbery. The prosecution presented evidence that on the day of the murders defendant needed money because he was behind on his truck payments. Defendant armed himself with a loaded gun and followed Wynglarz to Skillman's house. Defendant and Wynglarz fought with Rita on the front porch and pushed him into the house. Moments after defendant and Wynglarz entered the house, they subdued Skillman and Rita, who were both unarmed. Defendant shot Skillman and Rita, each twice. Skillman was shot at close range; Rita was shot from just a few feet away. When defendant and Wynglarz left the house, they were calm, smiling as they walked over to defendant's truck. From a neighbor's yard, to which he had escaped, Gattenby saw defendant carry a paper or canvas bag in his hand. From across the street, another neighbor saw Wynglarz carry a nylon-like bag that "bowed down" under the weight of its contents.

Based on this evidence, a rational jury could find beyond a reasonable doubt that defendant had gone into Skillman's house with the intent to steal, thus committing burglary. For the same reason, the evidence is sufficient to support not only defendant's first degree murder convictions based on the theory that they occurred in the commission of a burglary, but also the jury's burglary-murder special-circumstance findings.

Based on this same evidence, a rational jury could find beyond a reasonable doubt that before he murdered Skillman and Rita, defendant had formed the intent to take their property—drugs or money or both—and that defendant committed the murders to facilitate the taking of that property. A rational jury

could also find beyond a reasonable doubt that defendant took property from Skillman and Rita. When defendant and codefendant Wynglarz left the house after the murders, they took with them a bag and the bag's contents, which a rational jury could infer consisted of stolen money or drugs, or both, together with the murder weapon. Therefore, we conclude that substantial evidence supports not only defendant's convictions of robbery and first degree murder based on the theory that the murders of Skillman and Rita occurred in the commission of a robbery, but also the jury's robbery-murder special-circumstance findings that each murder occurred during the commission of robbery. (See *People v. Horning, supra,* 34 Cal.4th 871, 904; *People v. Bolden* (2002) 29 Cal.4th 515, 554 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Frye, supra,* 18 Cal.4th at p. 956.)

### 2. *Premeditated and deliberate murder*

With respect to the killings of Skillman and Rita, the trial court instructed the jury on felony murder based on burglary and robbery and also on premeditated and deliberate murder.

Defendant contends his murder convictions must be reduced to second degree murder because the evidence was insufficient to establish the murders were premeditated and deliberate and thus first degree murders. As we just concluded, the evidence was sufficient for the jury to have found defendant guilty of first degree murder based on the theory that the murders occurred in the commission of two felonies: burglary and robbery. As discussed below, we also conclude the evidence was sufficient for the jury to have found the murders were premeditated and deliberate.

In *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], we said that "generally first degree murder convictions are affirmed when (1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill." (*People v. Mincey* (1992) 2 Cal.4th 408, 434–435 [6 Cal.Rptr.2d 822, 827 P.2d 388].) These factors are not the exclusive means, however, to establish premeditation and deliberation; for instance, "an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127 [12 Cal.Rptr.3d 592, 88 P.3d 498].)

Here, based on the evidence, a rational jury could find beyond a reasonable doubt that defendant and codefendant Wynglarz went to Skillman's house to

rob Skillman of drugs or money. They arrived at Skillman's house separately to avoid any suspicion, and defendant carried a loaded gun. Within seconds of entering the house, defendant was waving a loaded gun above Skillman, who was lying on the floor near the front door, and at Rita, who was on the sofa a few feet away. Both men were unarmed, and Skillman pleaded for his life. Defendant replied, "I ain't taking your shit," and then shot Skillman and Rita. This evidence amply supports a finding of premeditation and deliberation.

### B. *Skillman's Statement to Gattenby*

Defendant contends the trial court erred by excluding a statement Skillman made to Gattenby shortly before defendant shot Skillman and Rita.

These are the relevant facts: At the preliminary hearing, on cross-examination by defendant's counsel, Gattenby testified that about 12:15 p.m. on the day of the murders, after codefendant Wynglarz had first left Skillman's house, Gattenby was upstairs with murder victims Skillman and Rita when he heard a knock at Skillman's front door. Skillman said, "[Wynglarz] burned me over a quarter ounce of meth. I don't know what [he] is up to. Stay up here." During his defense case, defendant sought to introduce this statement by Skillman to impeach Gattenby's testimony (on cross-examination by counsel for codefendant Wynglarz) and Wynglarz's testimony (on direct examination) that Skillman was friendly with Wynglarz on the day of the murders.

The trial court ruled that Skillman's statement was probative of his relationship with codefendant Wynglarz and was also relevant to explain Skillman's state of mind and conduct when he encountered defendant and Wynglarz at his front door.[8] The court admitted the portion of Skillman's statement that impeached Wynglarz's description of his relationship with Skillman as friendly ("I don't know what [he] is up to. Stay up here"), but it excluded the portion of Skillman's statement that mentioned that "[Wynglarz] burned me over a quarter ounce of meth" as more prejudicial than probative under Evidence Code section 352.

On appeal, defendant contends the trial court's redaction of Skillman's statement that "[Wynglarz] burned me over a quarter ounce of meth" violated article I, section 28, subdivision (d) of the California Constitution, which prohibits the exclusion of relevant evidence in any criminal trial except

---

[8] The trial court, on its own motion, considered the admissibility of Skillman's statement under the state of mind exception to the hearsay rule and ruled the statement was admissible on that basis. (Evid. Code, § 1250, subd. (a)(2).) That ruling is not at issue here.

as provided by statute. Defendant argues the trial court's reason for disallowing the introduction of the statement—its prejudicial nature—did not apply to defendant because admission of the entire statement was crucial to defendant's self-defense theory that Skillman was the aggressor and attacked defendant as defendant came in the front door.

Under Evidence Code section 352, which is an express exception to article I, section 28, subdivision (d) of the California Constitution, a trial court has discretion to exclude evidence when its probative value is outweighed by concerns of undue prejudice, confusion, or consumption of time. On appeal, we review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [13 Cal.Rptr.3d 34, 89 P.3d 353].)

Even if we assume the trial court abused its discretion in not admitting Skillman's comment that "[Wynglarz] burned me over a quarter ounce of meth," defendant suffered no possible prejudice. Admission of the redacted portion of Skillman's statement would have added little to defendant's theory at trial that Skillman was the aggressor and attacked defendant at the front door. On the day of the murders, Skillman had a loaded .22-caliber rifle in his bedroom. Yet he did not take that weapon with him when confronting defendant and codefendant Wynglarz at the front door. This alone undercuts defendant's theory that Skillman was the aggressor. Finally, the prosecution presented overwhelming evidence that defendant entered the house with a loaded weapon and almost immediately subdued Skillman and Rita and shot them execution style. Admission of the excluded statement would not have resulted in a more favorable verdict for defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Even if we were to assume error implicating defendant's rights under the federal Constitution, the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].

### C. *Further Cross-examination of Defendant by the Prosecutor*

Defendant contends the trial court erred in allowing the prosecution to reopen its cross-examination of defendant. These are the relevant facts: After defendant's arrest, the Westminster police interviewed him and advised him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). Defendant signed a consent form indicating that he had read his rights and understood them. During the interview, defendant denied any involvement in the two murders. He also denied that his pickup truck had been at the scene. After a few minutes, defendant asked for an attorney, and the officers stopped their questioning. The police tape-recorded the interview and defendant's request for an attorney.

At trial, defendant testified on his own behalf. He admitted that he was at the murder scene and that he had shot Skillman and Rita, but he claimed he was acting in self-defense. The prosecution then cross-examined defendant but did not ask him about his interview with the police. Thereafter, codefendant Wynglarz's counsel, in cross-examining defendant, sought to impeach him with statements he had made to the Westminster police. Defendant admitted he had lied to the police but claimed he had done so because he was confused, explaining that he asked to speak with an attorney because of this confusion.

Defendant's counsel conducted no redirect examination of defendant. The trial court then asked whether the prosecution wanted to question defendant regarding the issues raised by Wynglarz's counsel's cross-examination; the prosecutor said he did. Counsel for defendant objected, asserting that further cross-examination by the prosecution would be improper because defense counsel had conducted no redirect examination. The trial court overruled the objection, stating that defendant's comments to the police were a significant issue on which the prosecutor could properly cross-examine defendant. The prosecution then questioned defendant about his interview with the police, bringing out additional inconsistent statements and eliciting defendant's admissions that he had lied to the police.

On appeal, defendant contends the trial court abused its discretion by permitting the prosecution to "recross-examine" defendant. "As a general matter, an appellate court reviews a trial court's ruling as to the order of proof for abuse of discretion. That is because, as a general matter, the trial court has authority to 'regulate the order of proof' in the exercise of 'its discretion.' (Evid. Code, § 320.)" (*People v. Alvarez* (1996) 14 Cal.4th 155, 207 [58 Cal.Rptr.2d 385, 926 P.2d 365]; see § 1044 [the trial court has the duty to conduct a criminal trial in an orderly and expeditious manner]; Evid. Code, § 765 [the trial court has broad discretion to regulate witness examinations].) Under Evidence Code section 774, the trial court may permit reexamination of a witness on any new matter on which another party has examined the witness. The Law Revision Commission comment to this provision states that Evidence Code section 774 applies to direct, cross-, redirect, and recross-examinations.

We discern no abuse of discretion. Here, on cross-examination of defendant, counsel for codefendant Wynglarz raised the issue of defendant's prior inconsistent statements to the police. Defendant admitted he had lied to the police but claimed he was confused at that time, indicating he had requested an attorney during the interview. Because defendant's responses raised new issues about defendant's credibility, the prosecution was entitled to explore these issues. (Evid. Code, § 774; see also *People v. Chatman* (2006) 38 Cal.4th

344, 382 [42 Cal.Rptr.3d 621, 133 P.3d 534] [when a defendant voluntarily testifies, the district attorney may introduce evidence through cross-examination that explains or refutes his statements or the inferences that may reasonably be drawn from them].) Under these circumstances, we conclude the trial court did not abuse its discretion in allowing the prosecutor to reopen cross-examination of defendant.

Defendant argues that because the trial court allowed the prosecution to further cross-examine him, he was "forced" to play the entire audiotape of the police interview, which included his invocation of his right to counsel, and thus he was denied the opportunity to put on the "defense of his choice." We address this contention in our discussion of defendant's related claim of prosecutorial misconduct, where we more fully discuss the facts under which the audiotape of the police interview was played to the jury. (See pt. III.D.2., *post.*)

### D. *Alleged Prosecutorial Misconduct*

Defendant claims several instances of prejudicial misconduct by the prosecutor in violation of both the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. We conclude no prejudicial misconduct occurred.

 "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales, supra,* 25 Cal.4th at p. 44.)

Generally, a claim of prosecutorial misconduct is not reviewable on appeal unless the defendant makes a timely objection and asks the trial court to admonish the jury to disregard the prosecutor's improper remarks. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) In the absence of an objection, " 'the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*Ibid.*) Here, defendant did not object to any of the instances of purported prosecutorial misconduct. Because an admonition would have cured any possible harm from the claimed instances of misconduct, defendant has not preserved his claims of misconduct. In any event, defendant's contentions lack merit, as discussed below.

### 1. *Questioning defendant about the credibility of other witnesses*

Defendant asserts the prosecutor improperly cross-examined defendant on whether codefendant Wynglarz and witness Gattenby presented false testimony. The following exchange is an example of the prosecutor's "were they lying" line of questioning:

"[Prosecutor:] You heard Mr. Wynglarz tell in his version about how you encouraged him to get the [audio] speakers [from Skillman]; is that the way it happened?

"[Defendant:] No, sir, it is not.

"[Prosecutor:] Was that just a fabrication from Mr. Wynglarz in your opinion?

"[Defendant:] Yes, sir, it was a fascinating story. [¶] . . . [¶]

"[Prosecutor:] And, in fact, when you came into the house with the gun you heard Gerald Skillman come down the stairs and say, 'You guys don't have to do this. This is my mother's house'; you heard him say that?

"[Defendant:] No, sir, I didn't.

"[Prosecutor:] You heard Douglas Gattenby testify to that?

"[Defendant:] Yes, sir, I heard, but that was never said.

"[Prosecutor:] And you heard Douglas Gattenby tell this court and this jury that he heard you say, 'I ain't taking your shit,' and that is when you shot [Skillman]?

"[Defendant:] No, sir.

"[Prosecutor:] And you are saying Douglas Gattenby is lying about that, sir?

"[Defendant:] Yes, sir, he is lying about that. [¶] . . . [¶]

"[Prosecutor:] Now, you heard Mr. Wynglarz say that after the shootings you came upstairs to Gerald Skillman's bedroom; you heard him say that?

"[Defendant:] Yes, sir, I heard.

"[Prosecutor:] And you are saying that is a lie?

"[Defendant:] Yes, sir, it is a lie.

"[Prosecutor:] He is lying about that?

"[Defendant:] Yes, sir. [¶] . . . [¶]

"[Prosecutor:] As you sit here right now do you know of any reason that Mr. Wynglarz would lie about that fact?

"[Defendant:] I think he is just trying to save his own neck.

"[Prosecutor:] Now, he said that when you came up to the bedroom, that it was you who told him to take a bag, a duffel bag that was in the bedroom, to take it off the doorknob. Are you saying that that is a lie?

"[Defendant:] Yes, sir, it is a lie. [¶] . . . [¶]

"[Prosecutor:] And Mr. Wynglarz says that you took the gun with you and the bag and that he never saw them again?

"[Defendant:] No, sir, that is not correct.

"[Prosecutor:] He is lying about that?

"[Defendant:] Yes, sir, he is."

 Recently, in *People v. Chatman*, *supra*, 38 Cal.4th at page 384, we made these observations about "were they lying" questions by a prosecutor: "[C]ourts should carefully scrutinize [a prosecutor's] 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." With respect to asking such questions of a defendant, we stated: "A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*Id.* at p. 382.)

Here, by choosing to testify, defendant put his own veracity in issue. Defendant claimed that murder victims Skillman and Rita attacked him at the front door of Skillman's house, that he shot them both in self-defense, and that codefendant Wynglarz concealed defendant's gun in a bag as they left Skillman's house. Wynglarz denied that he planned to rob or shoot anyone, and testified he was shocked when defendant pulled out his gun, ordered Wynglarz into the house, and then shot Skillman and Rita. Gattenby testified that he saw defendant pointing a gun at Skillman and Rita, who had not threatened either defendant or Wynglarz. The prosecution's questions allowed defendant to clarify his position and to explain why codefendant Wynglarz or eyewitness Gattenby might have a reason to testify falsely. The jury properly could consider any such reason defendant provided; if defendant had no explanation, the jury could consider that fact in determining whether to credit defendant's testimony. (*People v. Chatman, supra,* 38 Cal.4th at p. 383.) Thus, the prosecution's questions in this case "sought to elicit testimony that would properly assist the trier of fact in ascertaining whom to believe." (*Ibid.*) There was no prosecutorial misconduct.

## 2. *Asserted violation of a trial court order*

Defendant contends the prosecution violated an order of the trial court limiting the scope of questioning of defendant regarding the statements he made during a police interview. As noted earlier, defendant initially waived his *Miranda* rights and agreed to talk with Westminster police officers about the murders of Skillman and Rita. After the officers had briefly questioned him, defendant said he wanted an attorney, and all questioning stopped. Police tape-recorded the entire interview, including defendant's invocation of his right to counsel.

At trial and outside the presence of the jury, the parties discussed the admissibility of defendant's statements to police. The trial court and the parties agreed that defendant's statements to the police were obtained in compliance with *Miranda.* The trial court ruled that defendant's statements were made voluntarily and could be introduced as prior inconsistent statements.

The prosecution said it had prepared an edited version of the recorded interview that redacted defendant's invocation of his right to counsel. The trial court agreed the jury should not hear the invocation. The court then stated: "[The prosecutor] can confront [defendant] with the [edited tape of the interview], and then [defendant] can explain it." The court indicated, however, that in questioning defendant about the taped interview, the parties should not "get into the *Miranda* issues."

During the prosecution's reopening of cross-examination of defendant, it asked this question: "You had already said that you were willing to talk without an attorney, didn't you?," to which defendant responded, "Sir, I was confused." The trial court interrupted, stating that the prosecution had violated the court's admonition not to question defendant "about the *Miranda* advisement." The court asked whether defendant's counsel wanted the court to give a limiting instruction, strike defendant's testimony, or play the entire taped interview. Defendant's counsel chose the latter. The tape recording was played to the jury and the prosecution resumed its cross-examination of defendant. On appeal, defendant contends the prosecution committed misconduct when it asked defendant whether he had told the police officers that he would talk to them without an attorney.

Assuming for the sake of argument that the trial court prohibited the prosecutor from questioning defendant about his willingness to speak to the police without an attorney when it said, "I don't think we need to get into the *Miranda* issues," defendant suffered no possible prejudice from the prosecution's question. The jury was already aware from the cross-examination of defendant by codefendant Wynglarz's counsel that defendant's statements to police were inconsistent with the version of events defendant testified to at trial. Defendant told the police he was not present when Skillman and Rita were shot; at trial, he admitted shooting them. Moreover, the prosecution's question to defendant whether he had agreed to speak to the police *without an attorney being present* was fully consistent with the prosecution's redacted version of the recorded police interview of defendant, which included the *Miranda* advisements. Defendant not only agreed that this redacted version of the recording should be played to the jury but also expressly requested that the jury hear the entire unredacted recording as a remedy for what the trial court perceived as the prosecutor's improper reference to defendant's initial waiver of his right to counsel.

For the same reasons, we reject defendant's contention that, as a result of the prosecutor's violation of the trial court's order not to question defendant about his *Miranda* advisements, defendant was prejudiced because he was "forced" to agree to the jury's hearing the entire taped police interview. Defendant, however, was not "forced" to agree to the playing of the tape-recorded statement for the jury. He could instead have asked the trial court to admonish the jury not to consider whether he had invoked his right to counsel. Such an admonition would have been more than adequate to eliminate any prejudicial effect arising from the prosecution's allegedly improper question. The question had little or no prejudicial effect because the prosecution made no mention of defendant's invocation of his right to counsel (from which the jury might have drawn an inappropriate inference of guilt), and mentioned only defendant's waiver of his *Miranda* rights, from which the jury could not have drawn any adverse inferences.

### 3. *Asserted misstatement of evidence*

The prosecution presented evidence that at 12:24 p.m. on the day of the murders, the Westminster Police Department notified officers to be on the lookout for two male suspects in a red dual-wheel pickup truck. Westminster Police Officer Steve Moore, then on motorcycle patrol, saw a truck matching this description, and followed it for about one mile. Moore noticed that codefendant Wynglarz, who was driving the truck, turned around several times and looked at him.

The prosecution's guilt phase closing argument included the following: "After the killings, [Wynglarz] drives the getaway car. Is that an accident? Remember, I was asking, 'Well, Mr. Tafoya, if it's your car and you don't want other people driving it, why didn't you ask for the keys?' [¶] The reason, I would submit, is Mr. Tafoya was the one with the gun. So if there would be a problem, if there would be a police officer who pulls them over, Mr. Wynglarz needs both hands on the wheel. He needs to drive. Mr. Tafoya has the gun free if he needs to use it. That is why Mr. Wynglarz is driving Mr. Tafoya's truck. He's the getaway driver. It allows the gun to be used if need be. Fortunately for all of us, . . . Officer Moore did not try to pull them over, because who knows what would have happened to Officer Moore."

Defendant complains the prosecutor misstated the evidence by arguing that defendant had the gun on his person while he and codefendant Wynglarz escaped in defendant's truck and by suggesting that defendant would have shot Officer Moore had he tried to stop them. We disagree.

 "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133 [8 Cal.Rptr.3d 271, 82 P.3d 296].) Whether the inferences drawn by the prosecutor are reasonable is a question for the jury. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Here, the prosecution neither mischaracterized the evidence nor assumed facts not in evidence, but merely drew permissible inferences from it. Although defendant testified that he put the gun in a bag and threw the bag in the back of his truck, no other witness so testified to his version of events. Moreover, according to codefendant Wynglarz, defendant had the gun on his lap as they drove away from Skillman's house. Thus, the prosecution's argument that defendant was armed during the getaway was consistent with the evidence and not improper.

Furthermore, the prosecution could reasonably infer from the evidence that defendant, a passenger in the getaway truck, might have used the gun he held

to shoot Officer Moore had the latter stopped defendant's truck. The evidence showed that defendant had just shot two unarmed men, Skillman and Rita, almost immediately after he entered Skillman's house.

4. *Claim that the prosecutor improperly advised the jury of his personal opinion*

Defendant faults the prosecutor for stating during closing argument that defendant was lying and characterizing defendant's testimony as "obviously fabricated" and "not based upon the truth." Codefendant Wynglarz objected that the prosecutor was improperly expressing his own opinion, and the trial court admonished the jury: "Ladies and gentlemen, that is correct. It isn't appropriate for—it isn't for the lawyers to decide who is telling the truth or not telling the truth. It is not their opinion that is important. It is your opinion. So it is, the lawyer's remarks are intended to suggest to you what they believe the evidence supports, not what they personally believe." Assuming Wynglarz's objection properly preserved this issue for defendant, we discern no prosecutorial misconduct.

"The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence, . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . ." (*People v. Pinholster, supra,* 1 Cal.4th at p. 948; accord, *People v. Wilson* (2005) 36 Cal.4th 309, 338 [30 Cal.Rptr.3d 513, 114 P.3d 758] [no impropriety in asserting that the defendant, who had provided conflicting versions of the events, was lying].) Here, the prosecution properly based its argument on the evidence admitted at trial or reasonable inferences drawn from it. A reasonable juror would have understood the prosecution's reference to defendant's lying during his testimony as describing the trial evidence rather than as a statement of the prosecution's personal opinion.

E. *Defendant's Requested Jury Instructions*

Defendant contends the trial court erred in refusing to give defendant's proposed special instructions G and H, thus depriving him of his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and under article I, sections 15 and 17 of the California Constitution. Not so.

Special instruction G read: "In considering the burglary special circumstance, a necessary element is that the burglary must have been done for some purpose other than the commission of the homicide itself. If the evidence shows only that the defendant committed a burglary in order to facilitate the homicide, you must find that there was no independent felonious

purpose. [¶] If from all the evidence you have a reasonable doubt that the defendant committed burglary for such independent felonious purpose, you must find the defendant not guilty of the burglary special circumstance." Special instruction H was identical to special instruction G except that it substituted the crime of "robbery" for "burglary."

These two instructions proposed by the defense merely duplicated standard jury instructions that the trial court gave, which told the jury that the special circumstances of murder in the commission of robbery and burglary are not established if the robbery or burglary was "merely incidental to the murder."[9] Accordingly, the trial court did not err in refusing to give these instructions. (*People v. Earp, supra,* 20 Cal.4th at pp. 902–903.)

### IV. PENALTY PHASE ISSUES

#### A. *Alleged Prosecutorial Misconduct*

At the penalty phase of the trial, the prosecutor's closing argument urged the jury to consider all of the evidence admitted during both the guilt and penalty phases of the trial, the aggravating evidence of criminal conduct presented in the penalty phase and proven beyond a reasonable doubt, and the mitigating evidence such as sympathy for defendant. After stressing that the jury had to follow the trial court's instructions, the prosecutor said: "What you may not consider. Number one, you may not consider the defendant not testifying in this phase of the trial. You are going to be instructed in this phase that that is not a fact that should even enter into your decision in any way. You cannot speculate as to the reasons why or why not. It is a fact that is not entitled to enter into your decision in any way, the fact that he did not testify in this phase of the trial. Certainly you can include all evidence from the last phase. You can discuss his testimony from the last phase of the trial. That is part of the evidence you have heard. But you cannot speculate or consider a defendant not testifying in this phase of the trial." Defendant made no objection to these remarks during the prosecutor's argument.

The next day, defendant asserted the prosecutor's comment was an improper reference to his failure to testify at the penalty phase. (See *Griffin v.*

---

[9] The trial court gave this version of CALJIC No. 8.81.17: "To find that the special circumstance referred to in these instructions as murder in the commission of burglary or robbery is true, it must be proved, one, the murder was committed while a defendant was engaged in the commission or attempted commission of a burglary or robbery [or] . . . [¶] two, the murder was committed in order to carry out or advance the commission of the crime or burglary or robbery or to facilitate the escape therefrom or to avoid detection, in other words, the special circumstance referred to in these instructions is not established if the attempted burglary or robbery was merely incidental to the commission of the murder."

*California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*).) The trial court made no ruling on the matter. Defendant raised the issue again in a motion for a new trial. The trial court ruled that the prosecutor's comment was improper but that it had not prejudiced defendant. The court noted that the comment was brief and only a small part of the prosecutor's penalty phase argument. The court thus concluded it was not likely the jury gave much weight to the comment.

Defendant now contends that the prosecutor's reference to defendant's failure to testify at the penalty phase requires reversal of the death judgment. Defendant concedes that he did not object to the comment when made, stating that he did not want to draw the jury's attention to it. We note that at the hearing on defendant's motion for a new trial, the trial court agreed with the defense that the prosecutor's remark was improper. Thus, it seems likely that had defendant objected to the remark when it was made, the court would have sustained the objection, stricken the prosecutor's comment, and admonished the jury not to consider it. Because an admonition would have cured any possible harm from the prosecutor's remark, defendant failed to preserve his claim of misconduct by failing to object. Even assuming defendant has preserved this issue for appeal, the claim lacks merit, as discussed below.

 "Under the Fifth Amendment of the federal Constitution, a prosecutor is prohibited from commenting directly or indirectly on an accused's invocation of the constitutional right to silence." (*People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d 629, 22 P.3d 392], citing *Griffin, supra,* 380 U.S. at pp. 614–615.) This rule applies to the penalty phase of a capital case. (*Mitchell v. United States* (1999) 526 U.S. 314, 327–328 [143 L.Ed.2d 424, 119 S.Ct. 1307]; *People v. Carter* (2005) 36 Cal.4th 1215, 1277 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *People v. Crittenden* (1994) 9 Cal.4th 83, 147 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Here, the prosecutor's comment echoed standard jury instruction CALJIC No. 2.60: "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. . . ." The prosecutor's comment also repeated defendant's special instruction J, which was given to the jury: "In deciding whether or not to testify at the penalty phase, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the crimes and conduct proffered as evidence in aggravation. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element." Under these circumstances, we conclude no misconduct occurred.

### B. *Unadjudicated Criminal Activity*

The prosecution at the penalty phase of the trial sought to present, as evidence of defendant's criminal conduct involving force or violence (§ 190.3, factor (b)), the rape of Susan M., which occurred in Anaheim some 15 years before defendant's capital trial. The Orange County District Attorney had charged defendant with the rape but was unable to proceed when Susan M. failed to appear for the preliminary hearing. Defendant objected to the evidence of the Susan M. rape as being more prejudicial than probative (Evid. Code, § 352), claiming it was too remote and thus unreliable. He also asserted that because the prosecution's records and most of the court records in that rape case had been destroyed in the normal course of business five years after the case was dismissed, his right to due process was violated by having to confront evidence of the rape allegations without possible exculpatory evidence that might have been contained in those destroyed records. The trial court overruled defendant's objection and allowed the prosecution to introduce the evidence.

Susan M. testified that two men, one Hispanic and one African-American, had raped her on January 27, 1980. That evening she had been working as a street-walking prostitute when she accepted a ride from defendant and a second man as she walked home on Katella Avenue in Anaheim. Defendant drove the car, and the second man sat in the front passenger seat. Susan M. got into the backseat. Almost immediately, the second man pointed a gun at Susan M., climbed into the backseat with her, and forced her to have sexual intercourse with him. Defendant then stopped the car, got into the backseat and forced Susan M. to have sexual intercourse with him. After these events, while still in the car with these two men, Susan M. saw police officers at a traffic accident and yelled for help through the car's backseat window. The police gave chase, following the car into a dead-end street, where Susan M. was able to get out of the car just before the police surrounded it and arrested defendant and the other man. At the penalty phase in this capital case, Susan M. did not recognize defendant, but she identified him from the booking photographs taken of him on the night she was raped. She admitted she had been convicted of a number of offenses, including robbery and attempted robbery, but she said that she had not been involved in any criminal conduct for more than 14 years.

Defendant further contends that section 190.3, factor (b), violates constitutionally protected rights to due process, a fair and speedy jury trial, confrontation of witnesses, and a reliable penalty verdict because it permits the use of unadjudicated criminal activity such as the Susan M. rape for which either the statute of limitations has run or the charges have been dismissed. We have repeatedly rejected such facial challenges to this statutory provision. (See

*People v. Anderson* (2001) 25 Cal.4th 543, 584–585 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1054; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1157–1163 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 [22 Cal.Rptr. 184, 711 P.2d 480].) Defendant fails to persuade us to reconsider these decisions.

Defendant claims violations of his rights under the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments based on the trial court's admission of the Susan M. rape evidence. Specifically, he asserts the evidence was unreliable because some 15 years had passed between the incident and his trial in this case, and because the unavailability of police reports and court records interfered with his investigation of the incident and prevented him from adequately defending against Susan M.'s account of the rape.

■■ "[T]he state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial." (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1161.) Remoteness of the prior criminal conduct affects the weight of the evidence, not its admissibility. (*Ibid.*) Here, although defendant's rape of Susan M. occurred 15 years before defendant's capital trial and some of the records of the incident were no longer available, defendant had ample information from which to prepare his defense, including copies of the municipal court records, the prosecution's report of its interview of Susan M. in preparation for this trial, and Susan M.'s rap sheet. Moreover, in this case, defendant conducted a vigorous cross-examination of Susan M., focusing on her extensive criminal history. He also was able to interview the other man involved in the raping of Susan M., as well as the prosecutor in the rape case. Further, the trial court here instructed the jury that before it could rely on this prior crime evidence, it had to find beyond a reasonable doubt that Susan M.'s rape allegation was true. (*People v. Sapp* (2003) 31 Cal.4th 240, 314 [2 Cal.Rptr.3d 554, 73 P.3d 433].) Under these circumstances, admission of the 1980 rape evidence did not deprive defendant of due process or otherwise violate his constitutional rights. (See *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1157–1158.)

Also without merit is defendant's contention that the rape evidence was irrelevant to the issues in the penalty phase. Under section 190.3, factor (b), a penalty jury can consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." To be relevant under this factor, the prosecutor's evidence must establish that the defendant committed a crime involving force or violence. (*People v. Combs* (2004) 34 Cal.4th 821, 859 [2 Cal.Rptr.3d 61, 101 P.3d 1007].) This relevancy requirement was met by Susan M.'s testimony at the penalty phase that, late in the

evening on January 27, 1980, defendant and another man raped her at gunpoint in the backseat of a car.

Defendant further argues that the prosecutor in the rape case failed to preserve "potentially useful" evidence, in violation of *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333]. That case holds that "unless a criminal defendant can show bad faith on the part of the [government], failure to preserve *potentially useful* evidence does not constitute a denial of due process of law." (*Id.* at p. 58, italics added.) Here, defendant merely speculates that the police files contained information that would have been "potentially useful" to his defense of the rape allegations. Furthermore, the prosecution did not act in bad faith, because the prosecution records were destroyed in the normal course of business as defense counsel conceded in the trial court. We agree with the Attorney General that a law enforcement agency cannot be expected to preserve criminal records for possible use at future capital trials as it has no way to foresee which arrestees or suspects will commit capital crimes in the future.

## C. *Penalty Phase Instruction*

### 1. *Defendant's requested jury instructions*

Defendant claims error in the trial court's refusal to give certain special instructions requested by the defense. He contends the absence of these instructions deprived him of a penalty phase verdict that was fair and not arbitrary as required under Fifth, Eighth, and Fourteenth Amendments to the federal Constitution.

Defendant requested special instruction C, which stated: "You are entitled to consider as a mitigating factor any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. You may not refuse to consider or be precluded from considering any relevant mitigating evidence."

Defendant's proposed special instruction D stated: "A jury has a '. . . constitutional duty to consider "any [sympathetic] aspect of the defendant's character or record" whether or not related to the offense for which he is on trial, in deciding the appropriate penalty.' "

Defendant's proposed special instruction E would have told the jury: "You are permitted to spare defendant's life 'for any reason or reasons you deem satisfactory, including humanitarian consideration, or for no reason, if you choose to do so.' "

The trial court properly refused to give these instructions because they were duplicative of the language of section 190.3's factor (k), as expanded in *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], and as set forth in CALJIC No. 8.85 and given to the jury, as follows: "You shall consider, take into account, and be guided by the following factors, if applicable: . . . [¶] (k) Any other circumstance which extenuates or lessens the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

### 2. *CALJIC No. 8.85*

Defendant makes several contentions regarding CALJIC No. 8.85, mentioned above, which identifies the aggravating and mitigating factors the jury may consider in deciding penalty. We have in earlier cases rejected these same contentions, and defendant offers no persuasive reason for us to reconsider them here. Below we summarize the holdings of those cases.

The trial court is not required "to instruct the jury not to 'double count' the same facts as circumstances of the crime and as special circumstances." (*People v. Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) "The jury's use during the penalty phase of unadjudicated criminal activity, as permitted by section 190.3, factor (b), does not render a sentence unreliable . . . ." (*People v. Koontz, supra,* 27 Cal.4th at p. 1095.) CALJIC No. 8.85 "is [not] constitutionally flawed because it fails to inform the jury that factors (d) ('extreme mental or emotional disturbance') and (h) of section 190.3 ('mental disease or defect or the effects of intoxication') can only be utilized as mitigating factors . . . ." (*People v. Stanley* (2006) 39 Cal.4th 913, 962 [47 Cal.Rptr.3d 420, 140 P.3d 736].) The trial court is not required to instruct the jury that the absence of any mitigating factor may not be considered aggravating. (*People v. Coddington* (2000) 23 Cal.4th 529, 639 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) The trial court need not delete irrelevant factors from CALJIC No. 8.85. (*People v. Box, supra,* 23 Cal.4th at p. 1217.) The trial court need not advise the jury "which statutory factors are relevant solely as mitigating circumstances and which are relevant solely as aggravating circumstances." (*People v. Farnam* (2002) 28 Cal.4th 107, 191 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

### 3. *CALJIC No. 8.88*

CALJIC No. 8.88 is a standard instruction regarding the jury's consideration of the aggravating and mitigating evidence offered at the penalty

phase.[10] Defendant contends this instruction violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and corresponding provisions of the California Constitution. Defendant challenges the instruction on several grounds, each of which, as defendant concedes, this court has previously rejected.

Thus, we conclude here that use of the phrase "so substantial" in CALJIC No. 8.88 does not render the instruction unconstitutionally vague. (*People v. Crew* (2003) 31 Cal.4th 822, 858 [3 Cal.Rptr.3d 733, 74 P.3d 820].) CALJIC No. 8.88 properly instructs the jury to " 'consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances' " and cautions against a " 'mere mechanical counting of factors.' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1161 [124 Cal.Rptr.2d 373, 52 P.3d 572].) The trial court need not instruct the jury that a single mitigating circumstance may outweigh all of the aggravating circumstances. (See *People v. Prieto* (2003) 30 Cal.4th 226, 263–264 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) Nor was the trial court required to define the meaning of life imprisonment without possibility of parole (*People v. Moon* (2005) 37 Cal.4th 1, 43 [32 Cal.Rptr.3d 894, 117 P.3d 591]) or otherwise instruct the jury that a defendant receiving such a sentence will never be paroled. (*People v. Dunkle* (2005) 36 Cal.4th 861, 940 [32 Cal.Rptr.3d 23, 116 P.3d 494].) The trial court has no obligation to define on its own motion the terms "aggravating" and "mitigating."[11] (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Contrary to defendant's assertion, these conclusions are not affected by the high court's decisions in *Ring v. Arizona*

[10] The trial court instructed the jury in the language of CALJIC No. 8.88 as follows: "[I]t is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you will be instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is *justified and appropriate* by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.)

[11] As noted on page 189, footnote 10, *ante*, the trial court in this case defined the terms "aggravating" and "mitigating."

(2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. (*People v. Chatman, supra,* 38 Cal.4th at p. 410.)

### D. *New Trial Motion*

After the jury returned its penalty verdict, defendant unsuccessfully moved for a new trial based on two claims of jury misconduct. He first asserted that during the guilt phase, a juror talked with a priest about the Catholic Church's position on the death penalty. Defendant also claimed that during the penalty phase deliberations, another juror had a conversation with her employer about the death penalty. On appeal, defendant contends the trial court erred in denying his motion for a new trial, thereby depriving him of his rights to counsel, an impartial jury, and due process under both the federal and state Constitutions. We reject his contentions.

#### 1. *Juror T.'s conversation with a priest*

##### a. *The facts*

During penalty phase jury deliberations, the foreperson, Juror H., sent a note to the trial court that read: "We have knowledge that one juror, after the guilt phase, spoke with a priest regarding the church's opinion about the death penalty." Upon questioning by the trial court outside the presence of the other jurors, Juror H. stated that during penalty phase deliberations Juror T. told another juror that he had briefly spoken with a priest about the death penalty. Thereafter, Juror T. described to all of the jurors the views of the priest and those of the Catholic Church regarding the death penalty. Juror H. could not recall either the priest's views or the Catholic Church's views on the death penalty, but remembered that one opposed the death penalty while the other supported it. When describing this conversation with the priest, Juror T. spoke loud enough for all of the jurors to hear.

Under questioning by the trial court, Juror T. said that two or three weeks earlier, he had a brief conversation with a friend who was a retired priest. Juror T. thought the conversation might have occurred during the guilt phase. The trial court took judicial notice that the jury returned its guilt phase verdict on February 8, 1995, three weeks before the trial court's questioning of Juror T. Juror T. said he met with the priest for personal reasons and not to seek advice on how to vote at the penalty phase of defendant's trial. During the conversation, Juror T. told the priest he was on a jury and inquired about the Catholic Church's position on the death penalty. The priest stated that he personally " 'probably would be against it' " but that " 'the Church approves the law of the land' " and thus that a person would " 'not [be] breaking any

law or any church law' " by voting in favor of the death penalty. Juror T. denied discussing the details of this case with the priest.

The trial court inquired whether Juror T. had asked the priest about the Catholic Church's position on the death penalty because Juror T. thought his penalty decision might conflict with church law. Juror T. replied: "No, when I was asked—when I first . . . was selected to become a juror, I was asked that question, if it bothered me, at that time I probably would have been honest and open, you know, up front about it. I went ahead and agreed to it. . . . [¶] And I—and when I say, I agreed to it, I agreed that—that I—that I—you know, if it meant the death penalty, it was justified, that—that I would uphold whatever I felt the law was. [¶] This was just a comment that was on my mind and I thought—well, maybe I can—I just throw it out there. That's all. I just threw it out there. [¶] I didn't—it wasn't for the purpose of [the priest] telling me what I could do and what I can't do. It was nothing like that, your honor." Juror T. explained that during the penalty phase deliberations, when the jurors were generally discussing the death penalty, he had mentioned his conversation with the priest, telling them: "I was told that you could follow the law of the land. And—and if it came down to that, you could follow the law of the land. He said it's permissible."

The trial court found that Juror T. had engaged in misconduct first by talking to the priest about the Catholic Church's position on the death penalty, possibly during the guilt phase, and second by relaying the contents of that conversation to the other jurors during penalty phase deliberations. The court removed Juror T. from the jury and individually asked the remaining jurors whether they could disregard Juror T.'s comments. All jurors except Juror V. said they would disregard Juror T.'s comments; Juror V. initially was uncertain whether she could disregard the comments but ultimately said that she would. After admonishing the 11 remaining jurors to disregard Juror T.'s comments about the priest's and the Catholic Church's views on the death penalty, the court selected an alternate juror, and it then instructed the jury to deliberate anew. Defendant did not move for a mistrial.

After the jury returned its penalty verdict, defendant sought a new trial, asserting that Juror T.'s misconduct entitled him to a new trial on issues of guilt. The trial court, for reasons discussed earlier, assumed that Juror T.'s conversation with the priest occurred during the guilt phase. The court reiterated its earlier finding that Juror T. committed misconduct first by talking to the priest about the Catholic Church's position on the death penalty and second by describing that conversation to the other jurors during penalty phase deliberations. The trial court found Juror T. to be truthful when he said during voir dire that he had no religious convictions about the death penalty that would affect his ability to be fair and impartial. The trial court further

found, based on its examination of Juror T., that the conversation with the priest had not influenced Juror T.'s guilt phase vote and that the conversation could not have affected the guilt phase votes of other jurors because Juror T. had not mentioned the conversation to his fellow jurors until the penalty phase. The court concluded that any misconduct by Juror T. based on his conversation with the priest was harmless "beyond any question."

### b. *Discussion*

Defendant contends the trial court erred in denying his new trial motion by finding that Juror T.'s conversation with the priest did not affect the guilt phase verdict. Defendant also argues that Juror T.'s information about the Catholic Church's view on the death penalty, which he conveyed to the other jurors, prejudiced penalty phase deliberations. We disagree.

■■■■ "[W]here a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance . . . which suggests a *likelihood* that one or more members of the jury were influenced by improper bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 294 [84 Cal.Rptr.2d 403, 975 P.2d 600].) A juror who "consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors" commits misconduct. (*Ibid.*) Jury misconduct "raises a rebuttable 'presumption' of prejudice." (*Id.* at p. 295.)

On appeal, the determination whether jury misconduct was prejudicial presents a mixed question of law and fact " 'subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303 [8 Cal.Rptr.3d 767, 82 P.3d 1249].) We accept the trial court's factual findings and credibility determinations if supported by substantial evidence. (*Id.* at p. 304.)

We assess prejudice by a review of the entire record. "The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985].) In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized. (*In re Hamilton, supra,* 20 Cal.4th at p. 301, fn. 21.) An admonition by the trial court may also dispel the presumption of prejudice

arising from any misconduct. (*People v. Zapien* (1993) 4 Cal.4th 929, 996 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

Here, the trial court found that Juror T. engaged in misconduct by discussing the Catholic Church's position on the death penalty with a retired priest and by describing this conversation to the penalty phase jury. Substantial evidence supports these findings.

We conclude, however, that the presumption of prejudice arising from the misconduct was rebutted. The trial court removed Juror T. from the jury and admonished the remaining jurors to disregard Juror T.'s improper comments. All remaining jurors agreed to do so. Substantial evidence supports the trial court's findings that Juror T.'s vote on guilt was not influenced by his conversation with the priest and that Juror T. did not share the content of this conversation with the other jurors during the guilt phase. We therefore conclude there is no inherent or substantial likelihood that the extraneous information influenced the jury's guilt phase verdict or that any juror was, on account of the extraneous information, actually biased against defendant. (*In re Carpenter, supra,* 9 Cal.4th at p. 653.)

Moreover, defendant suffered no possible prejudice at the penalty phase. The Catholic Church's position on the death penalty did not weigh in favor of a death verdict as it was a neutral position that encouraged the jury to follow the law of the land. The priest's opinion that he "probably would be against [the death penalty]" weighed in favor of leniency toward defendant. Further, in advising his fellow jurors of these views, Juror T. did not advocate for one view or the other. Under these circumstances, there is no inherent and substantial likelihood that the extraneous information influenced the other jurors or resulted in any juror's actual bias in rendering the penalty phase verdict. (*In re Carpenter, supra,* 9 Cal.4th at p. 653.)

2. *Juror V.'s conversation with her employer*

In seeking a new trial, defendant asserted that Juror V. had engaged in misconduct. At the hearing on the motion, defendant presented the following evidence: Susan Arganda testified she was an employee at Allstate Insurance in the City of Orange and was a close friend of defendant's sister, Sylvia Tafoya. On March 21, 1995, William Cole, house counsel for Allstate Insurance, came to the regional office where Arganda worked, and Arganda overheard him telling another person that one of his employees, Juror V., was on jury duty. Cole said the case involved two men who went into a "crack house" and killed two other men. He said his employee was very depressed over the death penalty, had been on jury duty for two months, and then went back for the penalty phase. Cole, Arganda testified, told the other person that

Juror V. had spoken with Cole about death row inmates and that Juror V. felt better after Cole told her "not all men that are sentenced to death row actually get the death penalty."

Cole testified that his employee, Juror V., was on jury duty during March and April 1995. Although he remembered speaking to Juror V. about her jury duty, he could not remember when this conversation took place. He recalled having a conversation about the death penalty with some employee but was unsure which one. Cole talked with Juror V. on several occasions because she was "very emotionally distressed" but had never discussed the particulars of the case. His concern in talking with Juror V. was "to try to calm her down and make her—allow her to make it through this whole process of being a juror on this case." Cole told Juror V. to listen to the judge and to follow the evidence. He recalled having only a single conversation with Juror V. that focused on the death penalty. At that time, Cole told Juror V. that many people on death row do not get executed. Cole assumed that this conversation occurred *before* the jury had returned its penalty phase verdict but he had no information to support his assumption.

Juror V. testified that she had spoken about the case with her employer, Cole, but she was certain she had done so *after* the penalty verdict because it was after the trial judge said the jurors were free to discuss the case. According to Juror V., Cole said she should follow the judge's instructions. Cole also stated that many people on death row are never executed. During this conversation, Juror V. thought Cole assumed that defendant's trial was still going on and that the jury had not yet reached a verdict; she did not correct this erroneous assumption. After the conclusion of the guilt phase, Juror V. asked Cole for more time off for the penalty phase. She denied telling Cole that she was depressed about the case but thought that her distress "probably showed [in her] face." Juror V. also denied discussing the facts of the case with Cole or anyone else before the jury had reached its penalty phase verdict.

The trial court took judicial notice that the jury returned the penalty phase verdict on March 3, 1995, almost three weeks *before* Arganda, on March 21, 1995, overheard a conversation between Cole and another person in which Cole said his employee, Juror V., was serving on a jury. The court found the evidence did not support a finding of juror misconduct and denied defendant's motion for new trial. On appeal, defendant contends this ruling was erroneous.

As earlier explained, we uphold a trial court's findings of fact and determinations of credibility when supported by substantial evidence. (*People v. Danks, supra*, 32 Cal.4th at p. 304.) Here, in concluding that no

misconduct occurred, the trial court found that Juror V.'s conversation with Cole, during which Cole said some death row inmates are never executed, took place after the conclusion of the penalty phase deliberations at which the jury returned the death verdict. Evidence supporting that finding came from Juror V., who testified she did not discuss the case with Cole until after completion of the trial, when the trial court told the jurors they could talk about the case. Cole could not remember when he spoke with Juror V. Arganda recalled that it was March 21, 1995 (some three weeks after the conclusion of the penalty phase in this case), that she overheard Cole telling someone about his conversation with Juror V. Thus, substantial evidence supports the trial court's finding.

### 3. *Inquiry into Juror V.'s mental processes*

Defendant contends the trial court violated his rights to due process and an impartial jury under the state and federal Constitutions when, at the hearing on defendant's new trial motion, it disallowed questioning of Juror V. regarding her possible reluctance to vote for the death penalty before the juror's conversation with Cole, her employer.

Here are the relevant facts: During questioning of Juror V., defendant's counsel asked her, "[A]fter the conversation with Mr. Cole, did you feel better?" Juror V. responded, "Yes." Counsel then inquired, "And that was because you were—you were reluctant to be responsible for a death penalty verdict; isn't that true?" The prosecutor objected to this question as contrary to Evidence Code section 1150, subdivision (a), which precludes the introduction of evidence "to show the effect of [any] statement, conduct, condition, or event upon a juror either in influencing [the juror's] assent to or dissent from the verdict or concerning the mental processes by which it was determined." The trial court sustained the objection. We perceive no error.

As we explained earlier, substantial evidence supports the trial court's finding that Juror V.'s conversation with Cole took place *after* the jury returned the death penalty verdict in this case. But even if the conversation had occurred before or during the penalty phase deliberations, we would not disturb the trial court's ruling. Evidence Code section 1150, as a matter of policy, "excludes evidence of the subjective reasoning processes of jurors to impeach their verdicts." (*People v. Steele* (2002) 27 Cal.4th 1230, 1264 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Here, the question defendant's counsel posed to Juror V., to which the trial court sustained the prosecutor's objection, impermissibly intruded into the juror's penalty phase deliberative process by inquiring whether Cole's comment to the juror, that not all death row inmates are executed, relieved Juror V. of responsibility when voting on the death verdict.

###### E. *Automatic Application for Modification of the Judgment*

▉ Defendant contends the trial court erred when, in denying his automatic application for modification of the death judgment (§ 190.4, subd. (e)), it did not independently review the evidence, thus depriving him of a reliable penalty determination and of due process of law under the Eighth and Fourteenth Amendments to the United States Constitution. Defendant, however, failed to make this assertion when the trial court ruled on the motion, and therefore he forfeited this issue. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969] [the contemporaneous objection rule applies to cases in which the modification hearing was conducted after this court's decision in *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984], became final].)[12] In any event, defendant's claim is without merit.

▉ "Under section 190.4, subdivision (e), a capital defendant is deemed to have automatically applied for a sentence modification. In ruling on the application, the trial judge must independently reweigh the evidence of aggravating and mitigating circumstances and determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict." (*People v. Mincey, supra,* 2 Cal.4th at p. 477.)

Here, in denying the automatic application for modification, the trial court stated, in relevant part: "[T]he circumstances of the present crime were substantially aggravating" based on defendant's having "intentionally shot and killed two people." The court further explained that the circumstances of the crime were sufficient to outweigh defendant's evidence and that based upon its *"independent review [of the evidence], the court does not disagree with the jury decision."* (Italics added.) There was no error.

###### F. *Miscellaneous Constitutional Issues*

Defendant asserts California's death penalty law is unconstitutional on several grounds, requesting that we reconsider our prior decisions rejecting

---

[12] In his reply brief, defendant suggests that if we deem this issue forfeited by counsel's failure to object to the trial court's ruling, we should treat the claim as one of ineffective assistance of counsel. Because defendant has not developed the merits of such a claim, we do not address it. Furthermore, as we have said in the past, a claim of ineffective assistance of counsel is more appropriately raised in a petition for writ of habeas corpus (see, e.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]), where "relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform the two-pronged inquiry of whether counsel's 'representation fell below an objective standard of reasonableness,' and whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].)" (*People v. Snow* (2003) 30 Cal.4th 43, 111 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

these same arguments. We decline to do so. We summarize below the holdings of those decisions.

The trial court need not instruct on a " 'presumption of life' " at the penalty phase of trial. (*People v. Perry* (2006) 38 Cal.4th 302, 321 [42 Cal.Rptr.3d 30, 132 P.3d 235].) The federal Constitution does not require the penalty phase jury's written findings or unanimous agreement on the existence of aggravating circumstances (*People v. Kennedy* (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472]), and the absence of these requirements in California's death penalty law does not deprive a capital defendant of meaningful appellate review (*People v. Dunkle, supra*, 36 Cal.4th at p. 939).

California's death penalty law comports with the Eighth Amendment's requirement of "narrowing" because the special circumstances narrowly define the class of defendants eligible for the death penalty. (*People v. Earp, supra*, 20 Cal.4th at pp. 904–905; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467–468 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

Section 190.3, factor (a), allowing the penalty phase jury to take into account the circumstances of the offense and the existence of any special circumstances found true, is not unconstitutionally vague. (*People v. Mendoza, supra*, 24 Cal.4th at p. 192.)

California's death penalty law is not unconstitutional in not requiring proof beyond a reasonable doubt or a preponderance of the evidence "as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Therefore, it follows that the trial court here did not err in not instructing on the burden of proof. (See *People v. Perry, supra*, 38 Cal.4th at p. 321.)

"Intercase proportionality review is not constitutionally required. [Citation.] Nor does equal protection require that capital defendants be afforded the same sentence review afforded other felons under the determinate sentencing law." (*People v. Dunkle, supra*, 36 Cal.4th at p. 940.)

The terms "extreme" and "substantial" as used in section 190.3 have commonsense meanings that the jury may be expected to use in applying the instructions. (*People v. Arias* (1996) 13 Cal.4th 92, 189 [51 Cal.Rptr.2d 770, 913 P.2d 980].) "The use of the word 'extreme' in section 190.3, factor (d) ('extreme mental or emotional disturbance') does not preclude consideration of mitigating evidence in violation of the Constitution." (*People v. Kraft*

(2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]; see also *People v. Arias, supra*, 13 Cal.4th at pp. 188–189 [factor (g) (" 'extreme duress or . . . substantial domination of another person' ")].)

The use of the phrase "whether or not" in certain factors (e.g., § 190.3, factor (d), "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance") does not suggest "that the absence of such factors amount[s] to aggravation." (*People v. Kraft, supra*, 23 Cal.4th at pp. 1078–1079.)

" '[P]rosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment.' " (*People v. Kirkpatrick, supra*, 7 Cal.4th at p. 1024, quoting *People v. Keenan, supra*, 46 Cal.3d at p. 505.) And "the [California] death penalty law does not violate the constitutional principle of separation of powers by delegating sentencing authority to the prosecutor. Ultimate sentencing power remains at all times with the judicial branch." (*Kirkpatrick*, at p. 1024.)

Our rejection of defendant's arguments is not affected by the United States Supreme Court's decisions in *Ring v. Arizona, supra*, 536 U.S. 584 and *Apprendi v. New Jersey, supra*, 530 U.S. 466. (See *People v. Davis* (2005) 36 Cal.4th 510, 571–572 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Ochoa* (2001) 26 Cal.4th 398, 453–454 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

## G. *Proportionality Review*

Defendant asks this court to vacate his death sentence as disproportionate to his moral culpability. In support, he cites the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

 "To determine whether defendant's sentence is disproportionate to his individual culpability, we examine the circumstances of the offense, including its motive, the extent of defendant's involvement, the manner in which the crime was committed, the consequences of defendant's acts, and defendant's personal characteristics including age, prior criminality, and mental capabilities." (*People v. Rogers* (2006) 39 Cal.4th 826, 895 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Here, as part of a planned robbery and burglary, defendant deliberately and callously shot and killed two unarmed men in the home of one of the victims. Defendant had a prior conviction for infliction of corporal injury on a child. We conclude that on these facts

defendant's sentence of death is not disproportionate to his "personal responsibility and moral guilt." (*People v. Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676].)

### H. *International Law*

Defendant contends he was denied the right to a fair and impartial trial by an independent tribunal in violation of customary international law as well as international treaties to which the United States is a party. He also claims he suffered racial discrimination in violation of international law at both the guilt and penalty phases of his trial. Because defendant has failed to establish his premise that he suffered violations of state or federal constitutional law, or that his rights to due process of law and to be free from racial discrimination were violated, we need not consider the applicability of those international treaties and laws to his appeal. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1055.) In any event, " '[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' " (*People v. Carey* (2007) 41 Cal.4th 109, 135 [59 Cal.Rptr.3d 172, 158 P.3d 743]; see *People v. Cook* (2006) 39 Cal.4th 566, 620 [47 Cal.Rptr.3d 22].)

### I. *Method of Execution*

Defendant argues that California's execution procedures are unconstitutional in two respects. First, he contends the Department of Corrections and Rehabilitation has not adopted standards for the administration of lethal injection as required under section 3604 and the California Administrative Procedures Act, and its failure to do so violates his right to procedural due process under the Fourteenth Amendment to the federal Constitution. Second, he claims California's lethal injection procedures violate the Eighth Amendment ban against cruel and unusual punishment. Defendant's claims are not cognizable on appeal because they do not affect the validity of the judgment itself and do not provide a basis for reversal of the judgment on appeal. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 45 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *People v. Rogers, supra,* 39 Cal.4th at p. 911; *People v. Cornwell* (2005) 37 Cal.4th 50, 105–106 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

### J. *Cumulative Error*

Defendant argues that the cumulative effect of the guilt and penalty phase errors requires reversal of his conviction and death sentence even if no single error compels reversal. Having found no prejudicial error, we reject this contention.

## V. Disposition

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 31, 2007.