Filed 2/9/24  P. v. Rivard CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| THE PEOPLE, | C097932 |
| Plaintiff and Respondent, | (Super. Ct. No. P18CRF0325) |
| v. | |
| RANDY JAMES RIVARD, | |
| Defendant and Appellant. | |

Defendant Randy James Rivard appeals from his convictions for sexual abuse of a child.  He argues the prosecutor committed misconduct during defendant's testimony and closing argument when she encouraged the jury to consider testimony on the child sexual abuse accommodation syndrome (CSAAS) for an improper purpose.  He also argues the prosecutor committed misconduct when she asked the defendant if the victim was mistaken about the acts of sexual misconduct defendant committed.  We will affirm.

## I.  BACKGROUND

The first amended information charged defendant with sodomy with a child 10 years old or younger (Pen. Code,[1] § 288.7, subd. (a)), oral copulation with a child 10

---

[1]  Undesignated statutory references are to the Penal Code.

1

years old or younger (§ 288.7, subd. (b)), lewd acts upon a child 14 or 15 years old and at least 10 years younger than defendant (§ 288, subd. (c)(1)), and unlawful intercourse with a minor (§ 261.5, subd. (c)).[2]

Prior to trial, the People moved to admit the expert testimony of Dr. Blake Carmichael on CSAAS to disabuse the jury of common misconceptions about child molestation victims. Defendant objected, but the trial court admitted the evidence.

The victim J.D. was born in 2000 and considered defendant a father figure. J.D. confided in defendant and thought of him as a best friend. J.D. wanted to spend time with defendant and enjoyed his company, but it always ended up being something else.

J.D. had difficulty remembering the precise details of defendant's repeated sexual abuse. J.D.'s earliest memories of defendant touching her in a sexual way were when she was eight years old when defendant would climb into bed with J.D. and touch J.D.'s body. Afterwards, J.D. would go into the bathroom and clean "wet and, like, slimy" stuff off her body. J.D. described one time it occurred while J.D.'s mother was sleeping in the same bed next to J.D.

When the victim was eight or nine years old, J.D.'s aunt noticed that the victim regularly had rashes in her vaginal area after having spent time at her mother's home. J.D. told her aunt the rashes were from playing with defendant.

One time when defendant and the victim were visiting his parents, defendant touched J.D. as J.D. was on her hands and knees.

When J.D. was between eight and 11 years old, defendant put his penis in J.D.'s mouth and pressed it up against J.D.'s teeth.

---

[2] At trial, the People stated they were unable to move forward on the unlawful intercourse charge due to a lack of proof and the trial court removed that count from the jury's consideration.

Defendant tried to have vaginal intercourse with J.D., but J.D. was afraid of getting pregnant, so defendant had anal sex with her instead. This happened for the first time prior to the victim's 11th birthday, and defendant continued sodomizing J.D. every time they were alone together until the victim was 15 or 16 years old. J.D. testified about a specific incident when she was between 13 to 15 years old.

J.D. testified defendant offered her video games, game consoles, and movies in exchange for having sex with him behind closed doors.

Another incident J.D. relayed to the jury was that defendant took J.D. to an amusement park when she was about 14 or 15 years old, and they stayed in a hotel room. This was the only time J.D. could remember when defendant put his penis in her vagina.

J.D. testified she understood what disassociation meant. J.D. believed that happened to her, as she tried to block out what was happening to her while she was being molested.

One of J.D.'s childhood friends testified that on J.D.'s 16th birthday, J.D. told her friend that defendant was molesting her. Another friend testified that, while the two were in middle school together, J.D. disclosed that defendant was molesting her

J.D. testified that, while she was in middle school, a police officer asked if the defendant had ever molested her. J.D. denied any assaults because she was afraid to be taken away from her mother and sent back to foster care.

Placerville Police Officer James Cayafas testified he received a report from a fellow student in 2015 that J.D. said her stepfather molested her by touching her. He interviewed J.D. at home, outside the presence of defendant and her mother. J.D. denied telling anyone at school or from child protective services that defendant touched her. J.D. said defendant had been in her life as long as she could remember, and she viewed him as a father and felt safe with him.

When J.D. was about 15 or 16 years old, J.D. refused to see defendant, leading defendant to become upset and call J.D.'s mother. He left approximately 50 voicemail

3

messages for J.D.'s mother demanding that she have J.D. contact him. After J.D.'s mother asked J.D. why she did not want to see defendant, J.D. told her mother about the abuse. This conversation occurred when she was 15 or 16 years old. J.D. also reported the abuse to the police. J.D. told the jury if defendant had stopped molesting her, she would have forgiven him.

When J.D. was 17 years old, J.D. told her aunt more specifics about being molested by defendant.

In 2017, El Dorado County Deputy Sheriff Terri Cissna was called upon to investigate allegations defendant was stalking J.D.'s mother by calling and sending text messages. J.D.'s mother was concerned about how to obtain a restraining order. Later during this investigation, J.D. told Cissna defendant had been molesting her for years.

Defendant also wrote incriminating text messages about his behavior. One said, "I [want] you to know that I love you so much, and it's not your fault. I hope you don't tell your mom. I do love you, and you won't have to see or hear from me again, no one will. Now you have a good life. I'm not there to mess it up. I just wanted you to love me. I'm glad I got to give you one last hug. I [love] you so much. Please clear these texts, please. I'm sorry. I'm going now because now I don't have anything anymore cuz when this comes out, I'm done, and no one ever will want to be around me again. I miss you so much. I'm going away now." "I just want to hear your voice. Let me say goodbye. Well, you won't talk to me for just one minute, so I love you, and I'm sorry, and I am glad that I got to know you. I love you so much. I'm sorry I fucked up your life. That won't be happening anymore. Bye mumpkin, I [love] you."

At one point during middle school, J.D. lied to a friend and said she had had an abortion.

At trial, Dr. Carmichael testified as an expert to "give opinions regarding behaviors associated with child victims of sexual abuse and misconceptions associated with those behaviors." Dr. Carmichael had not read the case file in this case, interviewed

4

anyone, or talked to J.D. Dr. Carmichael shared with the jury the concept of encouraging the child to keep the abuse secret and the use of threats of suicide to keep the child from disclosing the abuse. Under this rubric, Dr. Carmichael noted that abused persons often love and care for their abuser and might rely upon them for attention, protection, food, and shelter. In addition, a victim of sexual assault often feels helpless. Dr. Carmichael defined disassociation as the ability to block out certain information, and explained it is a common misconception that children can remember the exact details of the abuse. Dr. Carmichael noted memory was not a DVD or recording system, and children's memories are not fully functional. Children often cope with abuse by engaging in entrapment and accommodation. Victims of sexual abuse also often retract their disclosures of abuse or may provide incremental disclosures of the abuse over a long period of time. Abusers will often groom victims by engaging in innocuous activities that gradually lead up to molestation and then reward sexual behavior with gifts.

The prosecutor asked Dr. Carmichael, "Are there signs you look for when you are figuring out if a child is a victim of sexual abuse?" The trial court sustained the defendant's objection. The prosecutor then asked without objection, "Are there behaviors that you look for that indicate that a child has been sexually abused?" Dr. Carmichael responded, "So there are no set of behaviors that you can point to and say, that kid was abused, and that's the tricky part. Again, kids who have been sexually abused can be depressed. They can be anxious. They can develop symptoms of post-traumatic stress disorder, but people who have not been sexually abused also have those kinds of symptoms and reactions to other things. That's why it's important to understand there [are] a variety of ways kids react after they have been sexually abused. [¶] I talk to a lot of parents and let them know, sometimes there are no signs that the child is being abused, because parents will often blame themselves for not, quote, unquote, seeing the signs, or knowing something has happened, and having to reassure them there may not have been something to notice. That doesn't mean the child isn't grappling with things or

5

trying to deal with things. It's just they might be dealing with it or doing things that are not evident to other people. [¶] So it's a good question, and that's the best we have in our field. We have juries to make those decisions in the legal environment, and we don't make the decision if abuse happened or not."

Defendant testified he had known J.D. since she was six to eight months old. Defendant denied ever touching J.D. or any child in a sexual way. He also denied sodomizing J.D., engaging in oral copulation with J.D., engaging in sexual intercourse with J.D., or touching J.D. in a lewd and lascivious way. When the prosecutor cross-examined him, the prosecutor asked defendant, "So are you saying that [J.D.] is a liar?" and, "When [J.D.] got up on that stand and said that you stuck your penis in her butt, was she lying?" The trial court sustained defendant's objections, asserting the prosecution was asking the defendant to vouch for another witness. The prosecutor next asked defendant if J.D. was mistaken when she testified he sodomized her throughout her childhood. The trial court allowed this line of questioning over defendant's objections and the prosecutor asked defendant if J.D. was mistaken when she testified defendant (a) orally copulated her, (b) improperly touched her, (c) told her he was going to kill himself, and (d) promised he would stop touching her.

Defendant also admitted to having left the various aggressive voicemails and agreed that was irresponsible behavior. He explained the text messages referred to a broken promise not to get J.D.'s mother's nerves up, and that he did not want J.D. to tell her mother about her drug use.

Prior to closing arguments, the trial court instructed the jury with CALCRIM No. 1193, which states, "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome. Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in a child sexual abuse case. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child abuse. [¶] Dr. Carmichael's testimony about child sexual

6

abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not [J.D's] conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victim.

During her closing argument, the prosecutor argued defendant's conduct was consistent with grooming and manipulating victims as described by Dr. Carmichael. She also argued J.D.'s inability to remember some of the abuse, J.D.'s disassociation, J.D.'s actions, and the manner in which J.D. disclosed the abuse was consistent with a person who had been sexually abused as explained by the expert. The prosecutor did not argue or suggest these behaviors proved the sexual crimes occurred.

In his closing statement, defense counsel argued J.D.'s testimony about the abuse was not beyond question, arguing Dr. Carmichael testified that memories are not like DVD players, but rather a biological process. Counsel challenged J.D.'s credibility based on J.D.'s false statement of having an abortion. Defense counsel also highlighted J.D.'s denials of the abuse to child protective services and Officer Cayafas.

In rebuttal, the prosecutor argued to the jury, "Dr. Carmichael is not just some random human [who] took the stands [*sic*] in this case. He is an expert in his field, and he talked about how kids like this exhibit these signs and symptoms, and [J.D.] was so unbelievably consistent with everything [Dr. Carmichael] had to say, and not because he read this case and then took the stand and testified exactly the way she was. He knew nothing, nothing about [J.D.] or the charges or anything. He was just telling you his expert opinion on the way these kids act. There is no faking that. There just isn't."

The jury found defendant guilty of sodomy with a child 10 years old or younger (§ 288.7, subd. (a)), oral copulation with a child 10 years old or younger (§ 288.7, subd. (b)), and lewd acts upon a child 14 or 15 years old and at least 10 years younger than defendant (§ 288, subd. (c)(1)).

The trial court sentenced defendant to 40 years to life, plus a consecutive term of three years.

Defendant filed a timely notice of appeal.

## II.  DISCUSSION

Defendant first argues the prosecutor committed misconduct when she encouraged the jury to consider the CSAAS evidence for an improper purpose both in her questions and during closing arguments.  He also argues the prosecutor committed misconduct during cross-examination by asking defendant whether J.D. was lying.  We disagree.

### A.  *CSAAS Evidence and Argument*

Defendant argues the prosecutor engaged in prosecutorial misconduct when she attempted to elicit CSAAS evidence to show defendant had molested J.D. and further that she argued the testimony proved defendant molested J.D.  The record does not support this contention.

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under [California] law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' "  (*People v. Tafoya* (2007) 42 Cal.4th 147, 176.)  In this case, we conclude the testimony and argument were permissible.  Thus, the prosecutor did not engage in misconduct.[3]

Expert opinion testimony is admissible when the subject matter is "beyond common experience," and the opinion would assist the jury.  (Evid. Code, § 801, subd. (a).)  An expert opinion may be provided at trial even if the jurors have some

---

[3]  Because we reject this argument on the merits, we do not address the People's forfeiture argument or defendant's claim of ineffective assistance of counsel.

8

knowledge of the topic, as long as the testimony would assist the jury. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 [an expert may testify on a subject about which jurors are not " 'wholly ignorant' "].)

CSAAS is a model for understanding the behavior of children who have been sexually abused. The five components of the model are secrecy, helplessness, accommodation, disclosure, and recantation. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069.) In California, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418; see also *Mateo*, at p. 1069.)

Although expert testimony about how child sexual abuse victims commonly react is not admissible to show a child has in fact been sexually abused, it is admissible to show the alleged victim's conduct was not inconsistent with the conduct of someone who has been molested and to evaluate the believability of the alleged victim's testimony. (*People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1069.) As discussed in *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504, "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the victim's] apparently self-impeaching behavior

does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested."[4]

While the evidence may be considered to assist in determining the credibility of the victim and to demonstrate the victim's conduct is consistent with someone who has been molested, "the jury cannot be led to engage in the leap from: (1) many victims of sexual abuse do not disclose the abuse because they hold the abuser in high esteem; (2) the witness failed to disclose the sexual abuse; (3) the witness exhibits the same behavior as a class of actual victims of sexual abuse; therefore, (4) the witness was in fact sexually abused." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64.)

Defendant first points to the following question as evidence of the prosecutor's misconduct: "Are there behaviors that you look for that indicate that a child has been sexually abused?" Dr. Carmichael told the jury there is no set of behaviors that demonstrates a particular child was abused. He said children who have been sexually abused can be depressed, anxious or have posttraumatic stress disorder, but he also told the jury that children who have not been sexually abused can also have those same symptoms and reactions. Ultimately, Dr. Carmichael deferred this question to the jury. This question and the answer given were entirely within the navigational buoys provided for the use of this type of expert testimony as neither the prosecutor nor the witness argued the expert testimony could be used to show J.D. had been sexually abused.

---

[4] Prior to 2022, CALCRIM No. 1193 stated, "You may consider this evidence only in deciding whether or not ____'s *<insert name of alleged victim of abuse>* conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony." (Judicial Council of Cal., Crim. Jury Instns. (2021 ed.) CALCRIM No. 1193, p. 946; see also *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1072.) The current version of the instruction which was read to the jury removes the double negative of "not inconsistent" and replaces it with the equivalent (and more understandable) "consistent."

10

Defendant also argues the prosecutor's closing arguments inappropriately used this testimony. Again, we disagree. Consistent with CALCRIM No. 1193, the prosecutor told the jury that J.D.'s actions and testimony were consistent with Dr. Carmichael's testimony about how victims of sexual abuse might respond. In light of CALCRIM No. 1193, which specified the limited purpose for which this evidence was admitted,[5] the prosecutor's argument did not urge the jury to use this evidence to prove J.D. was an abuse victim. Rather, the prosecutor reminded the jury that J.D's testimony should not be disregarded just because it was not in vivid detail, or because she had engaged in late and incremental disclosure, or because she retracted some of her statements.

The prosecutor also reminded the jury that Dr. Carmichael's testimony dispelled the myths about late and incremental disclosure of sexual abuse allegations and how disassociation affects the memory of sexual abuse victims. The prosecutor pointed out that Dr. Carmichael knew nothing about J.D., the charges, or anything else about the case. Importantly, the prosecutor did not argue Dr. Carmichael's testimony established a certain set of parameters, J.D.'s actions fit those parameters, and, thus, defendant must have sexually assaulted J.D. Rather, on this point, the prosecutor argued the signs and symptoms discussed by J.D. in her testimony were consistent with the testimony Dr. Carmichael provided dispelling myths about children who may have suffered sexual abuse. We conclude the prosecutor did not engage in misconduct.

### B. Questions About Whether J.D. Was "Mistaken"

Defendant argues the prosecutor committed misconduct by asking defendant during cross-examination whether J.D. was lying. After the objection to the "lying" question was sustained, the prosecutor asked whether J.D. was "mistaken" as to

---

[5] We " 'presume [jurors] generally understand and follow the court's instructions.' " (*People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014.)

allegations of sexual abuse J.D. testified to on the stand.  Regardless of the exact wording of this question, the prosecutor's questioning was proper because this evidence was admissible.  (*People v. Chatman* (2006) 38 Cal.4th 344, 379-380 [it is misconduct for a prosecutor to intentionally elicit inadmissible testimony, but it is not misconduct to merely elicit evidence].)

Defendant's argument is premised on *People v. Zambrano* (2004) 124 Cal.App.4th 228, which defendant asserts stands for the proposition "are they lying" questions are impermissible and can constitute prosecutorial misconduct.  There, the court held the prosecutor's "were they lying" questions about the testimony of two of the police officers were impermissible because they were not relevant to any issue in the case.  (*Id.* at p. 240.)

The rule to be applied here is more correctly stated in *People v. Chatman*, *supra*, 38 Cal.4th at page 344.  In that case, defendant argued the prosecution wrongfully asked defendant about whether several witnesses who testified to different facts were lying.  (*Id.* at pp. 378-379.)  In response to defendant's argument that this questioning constituted prosecutorial misconduct, our Supreme Court stated, "[c]ourts from various jurisdictions have treated 'were they lying' questions differently.  One line of cases concludes they are always improper, while another concludes they are never so. [Citation.]  *Zambrano* joins a third line of cases that counsels a trial court to consider these questions in context.  ([*People v.*] *Zambrano*, *supra*, 124 Cal.App.4th at p. 239.)" (*Chatman*, at pp. 381-382.)  As explained by the *Chatman* court, a witness may not testify if he or she has no relevant knowledge of the events, or of any reason another witness might lie or be mistaken.  (*Id.* at p. 382.)  Any such testimony would be conjecture or speculation.  (*Ibid.*)  However, where a party challenges the testimony of a witness, that party "implicitly or explicitly urges that because a witness is lying, mistaken, or incompetent, the witness should not be believed.  A party who testifies to a set of facts contrary to the testimony of others may be asked to clarify what his position is

12

and give, if he is able, a reason for the jury to accept his testimony as more reliable." (*Ibid.*)

Given the broad scope of cross-examination, "[a] defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken. When, as here, the defendant knows the other witnesses well, he might know of reasons those witnesses might lie. Any of this testimony could be relevant to the credibility of both the defendant and the other witnesses. There is no reason to categorically exclude all such questions. Were a defendant to testify on direct examination that a witness against him lied, and go on to give reasons for this deception, surely that testimony would not be excluded merely because credibility determinations fall squarely within the jury's province. Similarly, cross-examination along this line should not be categorically prohibited." (*People v. Chatman*, *supra*, 38 Cal.4th at p. 382; see also *People v. Tafoya*, *supra*, 42 Cal.4th at p. 178.)

The defendant in *Chatman* took the stand and put his own veracity at issue. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 383.) He urged the jury not to believe a number of witnesses and instead believe him. (*Ibid.*) In these circumstances, it was permissible for the prosecutor to clarify defendant's own position and to ask "whether he knew of facts that would show a witness's testimony might be inaccurate or mistaken, or whether he knew of any bias, interest, or motive for a witness to be untruthful. The cross-examination was legitimate inquiry to clarify defendant's position." (*Ibid.*)

Here, defendant took the stand and put his own credibility and that of J.D. into issue when he denied he engaged in any of the sexual abuse alleged. On cross-examination, the prosecutor asked defendant whether J.D. was mistaken when J.D.

testified defendant (a) orally copulated J.D., (b) improperly touched J.D., (c) told J.D. he was going to kill himself, and (d) promised he would stop touching J.D.

The two witnesses to the allegations of sexual abuse defendant perpetrated on J.D. were only defendant and J.D. Defendant had known J.D. almost since birth. There may have been some reason defendant could offer as to why he believed J.D. was mistaken or why J.D.'s testimony might not be truthful, and he could have relayed that to the jury. The jury was also entitled to hear whether he did not have that insight. Either way, the jury could properly take that testimony into account. The prosecutor's questions sought to elicit admissible testimony and did not constitute prosecutorial misconduct.[6]

### III. DISPOSITION

The judgment is affirmed.

/s/
_____
Wiseman, J.[*]

We concur:

/s/
_____
Duarte, Acting P. J.

/s/
_____
Boulware Eurie, J.

---

[6] Similarly here, because we have rejected defendant's claim on the merits, we do not reach the People's argument defendant forfeited this claim by failing to make a specific objection as to prosecutorial misconduct, nor do we reach defendant's claims of ineffective assistance of counsel.

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.